# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Robert E. Blackburn

Civil Case No. 15-cv-02313-REB-GPG

U.S. COMMODITY FUTURES TRADING COMMISSION,

     Plaintiff,

v.

GREGORY L. GRAMALEGUI,

     Defendant.

---

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDERS

---

**Blackburn, J.**

     This case came before me for a trial to the court on February 27 and 28, 2018. The plaintiff, the United States Commodity Futures Trading Commission (CFTC), brings claims against defendant, Gregory L. Gramalegui, for (1) fraud by a Commodity Trading Advisory pursuant to 7 U.S.C. §§ 6*o*(1)(A) & (B); (2) failure to disclose prominently information about customer testimonials and hypothetical trading results pursuant to 17 C.F.R. §§ 4.41(a)(3) and 4.41(b), respectively; (3) violations of the CFTC's July 2001 Order; and (4) making false statements to the CFTC pursuant to 7 U.S.C. § 9(2). (**See Complaint for Injunctive Relief, Restitution, Civil Monetary Penalties, and Equitable Relief Under the Commodity Exchange Act** [#1][1] filed October 19, 2015; **Final Pretrial Order** [#324] filed February 7, 2018.) The parties appeared through their respective attorneys, and defendant Gregory L. Gramalegui appeared in person.

---

[1] "[#1]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

Having judicially noticed all relevant adjudicative facts in the file and record of this case pro tanto, considered the evidence educed at trial in its various forms, determined the credibility of the witnesses, weighed the evidence, considered all reasons stated, arguments advanced, and the authorities cited by the parties in both written and oral form, and being otherwise sufficiently advised, I enter the following findings of fact (which have been established by a preponderance of the evidence), conclusions of law, and orders.[2]

## I. FINDINGS OF FACT

I have jurisdiction over the parties to this action pursuant to 7 U.S.C. § 13a-1 (violations of the Commodity Exchange Act).

Venue is proper in the District Court for the District of Colorado pursuant to 7 U.S.C. § 13a-1(e).

Plaintiff, the U.S. Commodity Futures Trading Commission (CFTC) is the federal regulatory agency charged with administering and enforcing the Commodity Exchange Act ("CEA" or "the Act") and its regulations.

Defendant Gregory L. Gramalegui is a resident of Vail, Colorado. At all times relevant to this litigation, he marketed and operated an online trading room called Emini Trading Systems ("ETS").

I accept as established the following facts, to which the parties stipulated in the **Final Pretrial Order**, Exhibit A [#324-1], filed February 7, 2018:

---

[2] I state my findings of fact specifically and conclusions of law separately as required by Fed. R. Civ. P. 52(a)(1). Any finding of fact more properly deemed a conclusion of law, or any conclusion of law more properly deemed a finding of fact, shall be as more properly characterized.

1.  The "Emini" in the name ETS refers to the E-mini S&P 500 futures contract, which is traded on the Chicago Mercantile Exchange ("CME") and has the ticker symbol "ES" (hereinafter, "ES" or "ES contract").  As a futures contract, the E-mini S&P 500 represents an agreement to buy or sell the underlying S&P 500 stock index at a specified future date. However, the ES contract is cash settled, which means that no delivery of the stocks that make up the index takes place.  A trader engaged in day trading the ES contract places a directional "bet" (i.e., enters an order based on the expectation that the contract price will rise or fall) and then exits the trade with either a realized profit or loss.

2.  Defendant was born on November 26, 1960, and is 57 years old.

3.  Defendant has at all times been the sole owner and operator of the ETS Website.

4.  ETS was not a brick-and-mortar business; it was operated entirely through a website at http://www.eminitradingschool.com.

5.  Defendant developed the ETS products and services himself.

6.  On December 2, 2014, defendant produced to the CFTC a copy of the Website in native web format saved in a .zip file (Tr. Exh. 48).

7.  On January 14, 2015, CFTC counsel sent Robert Mackovski an email requesting a telephone call at his "earliest convenience."  When CFTC counsel and Mr. Mackovski spoke, counsel for the CFTC disclosed that a subpoena for documents and testimony was forthcoming and requested that defendant accept service via email.  Mr. Mackovski stated that he

would relay the request to defendant and left a voicemail on January 16th confirming defendant's consent to email service.

8.  At the deposition, which took place in Chicago on April 21, 2015, defendant was represented by Robert Mackovski and Gary Sinclair.

9.  Defendant did not provide an accounting of revenues or records of his sales.

10.  Defendant maintained a checking account at First Bank of Vail in the name of Trader 4x LLC ("Trader 4x Account").

11.  The majority of deposits into the Trader 4x Account came in the form of credit card transfers, without information identifying the associated customer.

12.  From June 22, 2011, through October 29, 2014, ETS revenues were also deposited into defendant's PayPal account ending in -9591. These revenues totaled $4,493.97.

13.  Defendant held or controlled three accounts with two futures commission merchants, AMP Global and Dorman Trading, LLC, during the period of March 2010 through October 2015.  Defendant did not hold, control, or execute trades in any other futures trading accounts during that time.

14.  As of April 8, 2015, the ETS Website was live.

15.  The text of the disclosures in the scrollbox on the bottom of webpages of the ETS website which the CFTC's preserved on October 7, 2014 (Tr. Exh. 638) read as follows:

4

Risk Disclaimer ~ Risk Disclosure

**\*RULE 4.41**

HYPOTHETICAL OR SIMULATED PERFORMANCE RESULTS
HAVE CERTAIN INHERENT LIMITATIONS. UNLIKE AN ACTUAL
PERFORMANCE RECORD, SIMULATED RESULTS DO NOT
REPRESENT ACTUAL TRADING. ALSO, SINCE THE TRADES
HAVE NOT ACTUALLY BEEN EXECUTED THE RESULTS MAY
HAVE UNDER OR OVER COMPENSATED FOR THE IMPACT, IF
ANY, OF CERTAIN MARKET FACTORS, SUCH AS LACK OF
LIQUIDITY.  SIMULATED TRADING PROGRAMS IN GENERAL
ARE ALSO SUBJECT TO THE FACT THAT THEY ARE
DESIGNED WITH THE BENEFIT OF HINDSIGHT.  NO
REPRESENTATION IS BEING MADE THAT ANY ACCOUNT WILL
OR IS LIKELY TO ACHIEVE PROFITS OR LOSSES SIMILAR TO
THOSE SHOWN.  SIMULATED RESULTS DO NOT
NECESSARILY IMPLY FUTURE PROFITS.  THE RISK OF LOSS
IN TRADING FOREX OR COMMODITY CONTRACTS CAN BE
SUBSTANTIAL. YOU SHOULD THEREFORE, CAREFULLY
CONSIDER WHETHER SUCH TRADING IS SUITABLE FOR YOU
IN LIGHT OF YOUR FINANCIAL CONDITION.

HYPOTHETICAL PERFORMANCE RESULTS HAVE MANY
INHERENT LIMITATIONS, SOME OF WHICH ARE DESCRIBED
BELOW.  NO REPRESENTATION IS BEING MADE THAT ANY
ACCOUNT WILL OR IS LIKELY TO ACHIEVE PROFITS OR
LOSSES SIMILAR TO THOSE SHOWN.  IN FACT, THERE ARE
FREQUENTLY SHARP DIFFERENCES BETWEEN
HYPOTHETICAL PERFORMANCE RESULTS AND THE ACTUAL
RESULTS SUBSEQUENTLY ACHIEVED BY ANY PARTICULAR
TRADING PROGRAM.

ONE OF THE LIMITATIONS OF HYPOTHETICAL
PERFORMANCE RESULTS IS THAT THEY ARE GENERALLY
PREPARED WITH THE BENEFIT OF HINDSIGHT.  IN ADDITION,
HYPOTHETICAL TRADING DOES NOT INVOLVE FINANCIAL
RISK, AND NO HYPOTHETICAL TRADING RECORD CAN
COMPLETELY ACCOUNT FOR THE IMPACT OF FINANCIAL
RISK IN ACTUAL TRADING.  FOR EXAMPLE, THE ABILITY TO
WITHSTAND LOSSES OR ADHERE TO A PARTICULAR
TRADING PROGRAM IN SPITE OF TRADING LOSSES ARE
MATERIAL POINTS WHICH CAN ALSO ADVERSELY AFFECT
ACTUAL TRADING RESULTS.  THERE ARE NUMEROUS
OTHER FACTORS RELATED TO THE MARKETS IN GENERAL

OR TO THE IMPLEMENTATION OF ANY SPECIFIC TRADING PROGRAM WHICH CANNOT BE FULLY ACCOUNTED FOR IN THE PREPARATION OF HYPOTHETICAL PERFORMANCE RESULTS AND ALL OF WHICH CAN ADVERSELY AFFECT ACTUAL TRADING RESULTS.

Any and all systems, methodology, or pattern discussed within or in any of the product materials are for illustrative purposes only and are not to be construed as specific advisory recommendations. This material and any opinions are for education purposes only. Testimonials are not indicative of future performance results or any success and my not be representative or indicative of the experiences of other clients or your own experience. EminiTradingSchool and Trader4x LLC does not verify or endorse any claims or opinions provided by the above individuals.

**Important Notice - Risk Disclaimer:**

Futures & Options trading has large potential rewards, but also large potential risk. You must be aware of the risks and be willing to accept them in order to invest in the futures and options markets. Don't trade with money you can't afford to lose. This is neither a solicitation nor an offer to Buy/Sell futures or options. No representation is being made that any account will or is likely to achieve profits or losses similar to those discussed on this web site. The past performance of any emini trading system or methodology is not necessarily indicative of future results.

16.  Neither "trading system" nor "advisory service" is defined in the CEA or the regulations promulgated thereunder.

17.  On October 20, 2015, CFTC Division of Enforcement Staff carried out the court's Statutory Restraining Order by copying a hard drive at defendant's residence in Vail, Colorado.

18.  On October 20, 2015, CFTC Division of Enforcement Staff carried out the court's Statutory Restraining Order by copying some documents and handwritten notes of defendant at defendant's residence in Vail, Colorado.

19.  A "system" can consist of a collection of products or a package.

20. Defendant's FirstBank account ending in number 6518 is titled in the name of Trader4X, LLC.

## A. The 2001 Order

Defendant is self-taught in the business of trading of futures contracts and, in particular, in the use of Market Profile, a method for viewing, organizing, and charting market data which was developed in the 1980s by a trader named J. Peter Steidlmayer.

Defendant started his first futures trading business in 1997 or 1998.

In 2001, the CFTC brought charges against defendant for fraudulent marketing of a software futures trading program called the "Trend Reflection Trading System." The CFTC charged that

> [i]n a series of magazine advertisements, Gramalegui made false claims that his mother traded the Trend System and implied that her trading results were positive. As such, Gramalegui's solicitations to actual and prospective customers of the Trend System constituted a practice or course business that operated as a fraud or deceit upon customers in violation of Section 4Q(l)(B) of the Act and Section 4.41(a)(2) of the Regulations.

(Tr. Exh. 2 ¶ III.A at 2.) In addition, the CFTC further alleged defendant

> failed to disclose the fact that the Trend System trading results he published in his magazine advertisements and on his Internet web site were hypothetical, rather than actual, trading results, in violation of Section 4.41(b) of the Commission's Regulations, which require that hypothetical trading and the inherent limitations of hypothetical trading be disclosed in the form prescribed by Section 4.41(b).

(Tr. Exh. 2 ¶ III.A at at 2-3.)

9. In response to these charges, defendant made an Offer of Settlement. On June 12, 2001, he agreed to the entry of an Order (the "2001 Order") by which it was

found that defendant, while acting as a Commodities Trading Advisor (CTA), had (a) engaged in a "practice or course of business which operates as a fraud or deceit upon any client or prospective client" in violation of, *inter alia*, 7 U.S.C. § 6*o*(1)(B); and (b) failed to provide in marketing materials the disclosure statement required by 17 C.F.R. § 4.41(b), concerning simulated or hypothetical trading results.  (Tr. Exh. 2 ¶ III.C at 3-4.)

The 2001 Order required defendant to cease and desist from violating § 6*o*(1)(B) and Rule 4.41(b).  (Tr. Exh. 2 ¶ VII.1 at 7.)

More specifically, the 2001 Order set forth a number of requirements to which defendant was to adhere in his advertising.  Specifically, defendant was not to

- "[M]isrepresent, expressly or by implication: (1) the performance, profits or results achieved by, or the results that can be achieved by, users, including himself, of any commodity futures or options trading system or advisory service; and (2) the risks associated with trading pursuant to any commodity futures or options trading system or advisory service;"

- "[P]resent the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of transactions in a commodity interest unless such performance is accompanied by [the disclosure statement required by Rule 4.41(b)].  In doing so, Gramalegui shall clearly identify those hypothetical or simulated performance results which were based, in whole or in part, on hypothetical trading results;"

- "[M]ake any representation of financial benefits associated with any commodity futures or options trading system or advisory service without first disclosing, prominently and conspicuously, that futures trading involves high risks with the potential for substantial losses;"

- "[R]epresent, expressly or by implication: (1) the performance, profits or results achieved by, or the results that can be achieved by, users, including himself, of any commodity futures or options trading system or advisory service; (2) the risks associated with trading using any commodity futures or options trading system or advisory service; (3) that the experience represented by any user, testimonial or endorsement of the commodity futures or options trading system or advisory service represents the typical or ordinary experience of members of the public

who use the system or advisory service; unless: (i) Gramalegui possesses and relies upon a reasonable basis substantiating the representation at the time it is made; and (ii) for two (2) years after the last date of the dissemination of any such representation, Gramalegui maintains all advertisements and promotional materials containing such representation and all materials that were relied upon or that otherwise substantiated such representation at the time it was made, and makes such materials immediately available to the Division of Enforcement for inspection and copying upon request."

(Tr. Exh. 2 ¶¶ VII.A-D at 7-9.)

The 2001 Order did not provide definitions for the terms "trading system" or "advisory service," nor incorporate by reference outside authority defining those terms.

In the years following entry of the 2001 Order, defendant operated a series of other online trading businesses marketing methods for trading futures or foreign currency ("forex") contracts, including Trader 4x (*see* Tr. Exhs. 645, 646 at 4), Eminitv (*see* Tr. Exhs. 647, 648 at 24), Tradology (*see* Tr. Exhs. 6 at 112, 293, 914 at 715), and Ask Market Profile Trading (*see* Tr. Exhs. 6 at 131, 136-137, 142-143; Exh. 884. (*See generally* Tr. Exh. 3 at 294-295.)

These trading businesses made marketing claims similar to those that gave rise to the 2001 Order and omitted the disclosures required by the 2001 Order. (*See* Tr. Exhs. 641-654.)

### B. Emini Trading Systems

#### 1. Structure and products offered

Defendant began operating ETS in 2009 through the website http://www.emintradingschool.com. (*See* Tr. Exh. 892.) ETS was not incorporated. (Tr. Exh. 106 ¶ 18.) Defendant claimed the ETS program was one he had been using for

over ten years.  (Tr. Exh. 640 at 34, 78, 251.)

The majority of the business's revenues were deposited in a bank account in the name of Trader 4x LLC.  (Tr. Exh. 131.)  At hearing on the CFTC's motion for preliminary injunction, defendant testified that all funds deposited in the Trader 4x account were received in connection with the operation of ETS.  (*See* Transcript at 41-42 [#44], filed March 14, 2016.)

In the period between October 19, 2010, and October 28, 2015, a total of $480,690.17 was deposited in the Trader 4x account.  (Tr. Exhs. 131, 136 at 18, 137.)

Defendant did not use his full name in connection with ETS, referring to himself as "Greg Lee," "Greg L.," or simply "Greg."  (Tr. Exh. 3 at 338, 660 at 71.)  A former ETS customer, Greg Ratica, testified at trial that he "[a]bsolutely" would not have purchased ETS had he know defendant had previously been charged with fraud by the CFTC.  (Tr. Transcript (Day 1) at 37.)

ETS offered a variety of products and services, including access to a trading room, software, written materials, videos, seminars, and one-on-one consultations.  A one-month subscription to the trading room cost roughly $300; the complete package of materials and services ran to nearly $7,000.  (Tr. Exh. 841.)

In marketing materials, discussed in more depth below, defendant represented his system was "simple to use and learn," made trading "easy," and could be learned in one week.  (Tr. Exh. 640 at 50, 58; 569 at 17.)

In theory, at least, that characterization seemed plausible.  Defendant's system essentially required the investor to identify the "day type" based on real-time market activity and then follow a set of rules for that day type.  (*See* Tr. Exhs. 640 at 47; 842 at

0391.0010.)  These rules then purportedly would generate "signals" indicating when to take a trade.  (Tr. Exhs. 640 at 47; 660 at 76, 93; 773 at 178, 189.)  These signals were consistently represented to be automatic and nondiscretionary.  (***See*** Tr. Exhs. 731 at 141, 144.)

In practice, however, this facially straightforward description belied a confusing and disorganized system set forth in a plan which ran to nearly 60 pages.  (***See*** Tr. Exh. 842.)  The lack of clarity was not improved by defendant's inconsistent explanations of how it worked.  For example, defendant at various points claimed there were six, seven, or eight different day types.  (***See*** Tr. Exhs. 747 at 146; 753 at 155; 73 at 197.)  In addition, defendant periodically sent customers additional pages of handwritten instructions supplementing the plan.  (***See*** Tr. Exh. 845.)  Defendant himself admitted he had not mastered the whole of his system.  (Tr. Exh. 3 at 30.)

Paul Durant purchased a package from ETS in February 2014 for $5,600.  The program defendant described to him was "very simple and easy to follow." (Tr. Transcript (Day 1) at 106.)  In his welcome package from ETS, Greg Ratica was promised that "[b]ecoming a better trader can happen in one week if you are new to trading or in a few days if you are an experienced trader."  (Tr. Exh. 569 at 17; Tr. Transcript (Day 1) at 40.)

Instead, Mr. Durant found the plan to be full of "very confusing logic" and the trading room to be confusing and hard to follow.  (***Id.***)[3]  The instructions as to how to identify the day type were "complicated and confusing."  (***Id.*** at 108.)

Mr. Durant further found the trade room so "[c]onfusing" and "cluttered" as to be

---

[3]  Although Mr. Durant had some experience in trading futures, the court finds that he was a largely unsophisticated trader.

"useless." (*Id.* at 109.) Videos of activity in the trading room on certain days played during the trial bears out Mr. Durant's description and experience of the trading room as cluttered and confusing.

The trading room appears essentially as a chart, with the price levels shown on the vertical axis and the time of day on the horizontal axis. The screen is crowded with multiple horizontal and vertical lines, some solid, some dotted, of various colors, the combinations of which correspond to various pieces of information about the market. (*See* Tr. Exhs. 695 & 759; 698 & 761; 697 & 760.) Through an audio component, defendant can be heard narrating what purportedly was happening on the screen. Periodically, he would add text to the screen to further illustrate market events. Even with the benefit of transcripts and interpretation from witnesses, it was exceedingly difficult to make sense of what the graphics were attempting to represent.

Yet even for a more sophisticated trader, such Greg Ratica, who also testified at trial, defendant's product was not worth what he paid for it. Mr. Ratica testified he could have learned as much by purchasing a book on Market Profile for $50. (Tr. Transcript (Day 1) at 73-74.)

Moreover, contrary to its marketing, the ETS system was not automatic. Instead, ETS employed a trading method based on Market Profile. As defendant's expert, David Aronson, testified at trial, a trading methodology which employs Market Profile (as defendant's purportedly does) per force employs a subjective or discretionary strategy, as opposed to one which relies on a predetermined algorithm or set of rules that generate definitive buy and sell signals. Although defendant had made some additions

12

or adjustments to Market Profile, Mr. Aronson characterized the ETS product as employing "a highly interpretive, subjective approach." (Tr. Transcript (Day 2) at 260-262.) Defendant himself admitted his software was not automatic and instead required the user to determine for himself where to place a stop or exit a trade. (*See* Tr. Exh. 3 at 144-150, 171.)

Throughout this litigation, defendant has maintained that his products and services were purely educational in nature and that he himself was merely a teacher. I rejected this argument previously and found defendant was a commodity trading advisor ("CTA").[4] (*See* **Order Re: Objections to Recommendation of the United States Magistrate Judge** at 2-5 [#273], filed July 31, 2017.)

In his expert report, defendant's expert, David Aronson, opined that defendant did not provide an advisory service because, *inter alia*, his advice was not specifically tailored to a particular client. (*See* Tr. Transcript (Day 2) at 273.) At trial, however, Mr. Aronson testified that the terms "CTA" and "advisory service" were identical; that is, a CTA by definition provides advisory services. (Tr. Transcript (Day 2) at 71-72.) The CFTC's expert witness, Jack Schwager, testified that in his opinion, defendant both advertised and offered an advisory service as that term is commonly understood in the futures industry. (Transcript (Day 2) at 93.)

## 2. Marketing

Defendant marketed ETS using a variety of methods, including distributions to email lists, presentations, seminars, and videos.

---

[4] Moreover, as the CFTC's expert witness, Jack Schwager, testified at trial, the roles of CTA and teacher are not mutually exclusive. (Tr. Transcript (Day 2) at 326.)

Defendant's marketing was designed to appeal to novice or inexperienced traders who "dreamed about becoming a professional emini day trader and saying goodbye to the work day world." (Tr. Exh. 640 at 1; *see also* Tr. Exh. 650 at 4 ("Day Traders can live wherever they want, work as few hours as they want each day and not have a boss or employees.").) ETS's system was represented to constitute an "exciting alternative for creating and maintaining wealth." (Tr]. Exh. 640 at 1.)

Mr. Durant testified at trial that he purchased the ETS system intending ultimately to be able to replace his $50,000 a year income as a machinist. Instead, he lost over half his account – more than $6,000 – trading in the ETS system. (Tr. Transcript (Day 1) at 109.)

In his marketing materials and presentations, defendant made various representations about the performance, profits, and results he and others had achieved as a result of using the ETS trading system and implied that others could achieve similar success.[5]

Defendant made general claims suggesting the ETS trading approach was based on proven "winning" (i.e., profitable) trading strategies (Tr. Exh. 640 at 58) and was "consistently profitable throughout the years" (Tr. Exh. 484).

Defendant also made specific claims about the performance and potential profits associated with the ETS trading system. He repeatedly touted how he was "winning every day" in the markets, and claimed traders also could "win" consistently once they

---

[5] Many of the claims made by defendant in his various marketing media were repeated in the same or much the same way on multiple occasions. Thus, my citations to the evidence of record are by way of example, but are not necessarily exhaustive of all the evidence in the record which supports these findings of fact.

learned his system.  (Tr. Exhs. 341, 342, 396, 414, 416, 418, 420, 423, 426, 432, 433, 448, 449, 505, 507, 508.)

Although defendant claimed, in response to discovery, that by "winning day" he meant "[s]uccessfully identifying and applying the trading plan with the day types and corresponding set-ups and their destination levels" (Tr. Exh. 83 at 9), his marketing materials plainly suggest that "winning" trades were ones that realized a profit (***see, e.g.***, Tr. Exh. 348 (touting a "highly profitable day" in which defendant "identified four winning trades"); Exh. 408 ("This is not a get rich fast scheme, but a way to win each day."); 627 at 130 ("I trade till I win and then done.").

Mr. Ratica testified that to him, a "winning day" indicated one in which the trader realized a profit from an actual trade.   As Mr. Ratica noted "this is not some type of board game that you're playing for points."  (Tr. Transcript (Day 1) at 63.)

Defendant claimed traders using his system were highly successful, i.e., profitable.  He made specific claims as to the magnitude of profitable trades customers could expect.  (***See, e.g.***, Tr. Exhs. 151-153, 155, 157, 159-164, 166, 179 (claim that "[m]ost traders have made enough on one trade to pay for the monthly subscription"); Tr. Exhs. 723 at 3, 660 at 76, 729 at 126, 736 at 12 & 15 (transcripts of marketing presentations in which defendant suggested traders had made anywhere from 3 to 30 points[6] profit in a day).)

Defendant also suggested he had successfully used the system to purchase a luxury sports car (***see*** Tr. Exhs. 660 at 85 & 659) and promised that, by following his plan, traders could "say[] goodbye to the work day [sic] world" (Tr. Exh. 640 at 1).

---

[6] In other words, having purchased the contract at a certain price, the trader later sold that contract at a price 3 to 30 points higher.

Further, defendant's marketing suggested he engaged in actual trading within the trading room. Communications with new customers suggested that they were part of a "real money trading room." (Tr. Exh. 513.) Defendant repeatedly stressed that he was actually trading on his own account in the trading room using real money. (***See, e.g.***, Tr. Exhs. 516, 530, 630 at 83, 755 at 9, 865.) He pointed to this purported fact to differentiate himself from competitors. (Tr. Exhs. 755 at 9, 865.)

Testimonials used in marketing the ETS system also stated outright "Greg trades real money right alongside us and isn't afraid to show and explain the losers. I believe this makes the entire method legitimate." (Tr. Exhs. 640 at 38, 818 at 5.)

Users' experience in the trading room seemed to confirm this impression. The two former customers who testified on behalf of the CFTC at trial – Greg Ratica and Paul Durant – both believed defendant was actually trading with real money. As Mr. Ratica testified, the trading room password was "wereallytrade10." (Tr. Transcript (Day 1) at 40; ***see also*** Tr. Exhs. 514, 547, 569.) Mr. Ratica testified "there's a big difference between trading with demo, a demo account, versus real money. When you trade with real money, all the other factors, psychological factors, come into play, the fear, the greed. (Tr. Transcript (Day 1) at 68.)

Moreover, Mr. Ratica testified that the way defendant interacted in the trading room – setting break even and profit target points for a particular contract, telling the room that he was "getting out" at a particular point or had "filled in" a contract, and stating "I win" with respect to a trade – all led him to believe defendant was actually engaged in real trades. Viewing a video showing activity in the trade room, Mr. Ratica

identified various points at which defendant noted profit targets and break even points, suggested traders "go long" (i.e., buy futures contracts), identified where to place "stops" (i.e., an order identifying a particular price point, which if reached, will cause that contract automatically to be closed out), and indicated that he was closing out particular positions.  (Tr. Transcript (Day 1) at 47-72.)

Michelle Bougas, a Futures Trading Investigator with the CFTC's Division of Enforcement, testified at trial that despite defendant's claims of "winning" consistently in the market, in the period from March 2010 through February 2015, although defendant had profitable days, he suffered net losses in 36 of those 60 months.  Cumulatively, his losses during this period totaled $15,697.98.  In months where he did realize a profit, his profits were comparatively meager – the maximum profit in a single month was $538.19. In several months, defendant's net profits totaled less than $10 for the month. Defendant was similarly unprofitable in the period from March to October 2015.  (**See** Tr. Exhs. 147, 148; Tr. Transcript (Day 1) at 158-173.)

Defendant's marketing campaign did not accurately reflect this performance history.  For example, repeatedly in marketing emails, defendant claimed to have had a "winner" on a particular day, when in fact he had not traded at all on that day.  Likewise, defendant frequently represented that he had experienced a particular number of "winning" days in a row, when in fact not only had he traded on fewer than the specified number of days but actually had net losses, not profits, on some of those days.  (**See generally** Tr. Exh. 148.)  On two specific occasions, plaintiff touted having realized a "huge winner" on the preceding day (**see** Tr. Exhs. 153 & 281), when records in fact reflect he made but $8.50 on both those days (**compare** Tr. Exh. 148 Rows 6 & 35).

17

Indeed, defendant admitted he did not "back test" his trading system and had no records to substantiate his performance claims. In fact, he maintained he did not track his own or his customers' trading performance at all. (*See* Tr. Exhs. 3 at 195-196, 271-272, 316; 70 at 6; 106 ¶ 55.) Nevertheless, his marketing implied that his strategies had been tested. (*See* Tr. Exh. 660 at 98.)

Defendant also made representations in his marketing about the functionality and predictive ability of the ETS trading system.

Defendant claimed the ETS trading plan was 90 percent (or sometimes 95 percent) accurate. (Tr. Exhs. 9 at 141, 660 at 118, 697 at 29.) He compared his system's ability to predict the market to having a "crystal ball." (Tr. Exh. 761 at 18.) He touted ETS as being able to predict prices "to the tick," i.e., to a precise incremental change. (*See, e.g.*, Tr. Exhs. 180, 334, 398, 434, 640 at 50, 723 at 6, 724 at 17.)

Concomitantly, defendant suggested his system decreased the risks involved in trading futures contracts. He promised low risk-reward ratios as a result of employing the ETS system, and suggested that the "stops" built into the program minimized risk. (*See* Tr. Exhs. 640 at 50; 729 at 120.)

These claims were aspirational rather than actual. When questioned at his April 2015 deposition[7] as to the basis for the ETS website's claim that "[o]ur trades often boast a 5:1 reward-risk ratios" (Tr. Exh. 640 at 50), defendant acknowledged that as a "Market Profile trader, that's what you want it to be" and suggested "it would be nice to get" at 4:1 ratio (Tr. Exh. 3 at 173).

---

[7] *See infra* ¶¶ I.B.4.

Defendant's marketing also implied his trading system was automatic. The ETS website represented that the trading software "directs which way to trade each and every day." Defendant claimed the software would tell customers where to place price stops and when to exit a trade profitably and that the stops would "automatically adapt to the current market conditions." (Tr. Exh. 640 at 32, 47, 50, 76; *see also* Tr. Exh. 733 at 161 (stating that ETS was "easy because the trading plan tell us what to do. We're not here to think.").) Mr. Durant testified ETS was attractive to him specifically because it was represented to be an automatic system.

### 3. Disclosures

In connection with the marketing of ETS, defendant provided testimonials and hypothetical performance results on its website and in marketing emails and marketing videos.

Pursuant to the terms of the 2001 Order, such representations were required to be accompanied by certain disclosures.

I have already found defendant's disclosures inadequate as to certain specific hypotheticals and testimonials set forth in his marketing materials. (***See* Order Re: Objections to Recommendation of the United States Magistrate Judge** at 11 ¶ 3.a. [#273], filed July 31, 2017.)

I denied the CFTC's motion for partial summary judgment as to exhibits constituting screen captures of defendant's website. (***See id.*** at 8-10 & ¶¶ 2.a. & 3.b. at 11.) Those exhibits were admitted without objection at the trial. (***See*** Tr. Transcript (Day 1) at 212-213; Tr. Exhs. 640, 651, 652, 653, 654.)

Each of these versions of the ETS website contains both testimonials (*see* Tr. Exhs. 640 at 36-40; 650 at 23-26; 651 at 36-39; 652 at 23, 27-29, 31-32; 653 at 11-12) and hypotheticals (*see* Tr. Exhs. 640 at 72, 209, 227; 651 at 15-16, 22-23, 25-27, 42-45; 652 at 28-32). With respect to each of these examples, a "Risk/Disclosure/Risk Disclaimer" mimicking that recited in paragraph 5.*o.* of these Findings of Fact appears at the bottom of the page.[8]

The disclaimer appears in 7-point font, in a box beneath a box containing "Quick Links" to other parts of the website, as well as links to follow ETS on various social media, subscribe to the newsletter, and/or receive a free three-day trial of the program. The are not equally prominent, let alone more prominent, than the substantive surrounding text or the advertising on the same page.

Defendant also sent out various marketing emails which also contained hypotheticals and/or testimonials. Each contained a more abbreviated risk disclaimer than that found on the ETS website.[9] Similarly to the website, the disclaimer appeared at the very bottom of the email in 7- or 8-point font, much smaller than the substantive text of the email. (***See, e.g.***, Tr. Exhs. 152-153; 155; 157; 159; 162-165; 199; 203; 207; 222-223; 227; 229-230; 241; 249; 279-281; 285-287; 291=294; 296-298; 306-307; 324; 328; 334-335; 341; 346; 348; 351; 353-354; 357-365; 368-371; 373-382; 384-386; 392;

---

[8] Because the exhibits are in paper format, it is not entirely clear how the disclaimer would have appeared on a computer screen. As printed out, the disclaimers most typically appear on a separate subsequent page or pages from the content to which they refer. The court finds it reasonable to infer that a viewer of the website would have to scroll to the very bottom of the web page to view the disclaimer.

[9] The fuller risk disclosure found on the website was abridged after defendant complained to his sales agent that the longer disclosure took up one-third of the email. (***See*** Tr. Exh. 477.)

394-398; 407; 410; 416-418; 421; 424-425; 427-428; 430-431; 434-437; 439-452; 454-455, 457; 472; 476; 484; 541.)

On October 15, 2014, the CFTC requested defendant produce copies "of each and every advertisement or marketing material, including but not limited to customer testimonials, used by you or your agents to market or advertise ETS in any manner" are required by the 2001 Order.  (Tr. Exh. 40 at 2.)

Defendant's response consisted of three "testimonial" emails (which were not marketing emails but rather emails from customers who had provided testimonials to defendant) (*see* Tr. Exhs. 45-47), a prototype email described as containing "news, price and info update[s]" (Tr. Exhs. 50; 44), and a copy of the ETS website (Tr. Exh. 48). Otherwise, counsel for defendant claimed that defendant "does not advertise in the traditional sense of the word.  There are no magazine ads or buyi [sic] placements or placing 'ads' on other websites.  My client gets prospective customers from search engines like google and yahoo." (Tr. Exh. 44.)

Defendant testified that he did not retain copies of marketing emails.  (Tr. Exh. 3at 240.)  Nevertheless, in November 2016, defendant produced more than a hundred such emails to the CFTC for the first time.  (*See* **Order Overruling Objections to Recommendation of the United States Magistrate Judge** at 2-3 [#283], filed August 28, 2017 (approving and adopting magistrate judge's recommendation to impose sanctions relating to this belated discovery.)  In addition, the CFTC recovered other ETS marketing materials from third parties.

As described in more detail below, the copy of the website defendant produced to the CFTC had been altered. Unbeknownst to defendant, the CFTC had taken screen captures of defendant's website one week prior to its production request.

Defendant did not preserve as backup copy of his website as it existed at the time of the CFTC's request prior to overwriting it with the changes noted above. Nor did he advise the CFTC that he had made any changes to the website prior to producing it.

The magistrate judge previously found defendant had engaged in "pervasive, continuous and intentional pattern of discovery violations" representing "an intentional plan to deprive the CFTC of discovery with which it should have been otherwise provided" in this case. (*See* **Order Re: Objections to Recommendation of United States Magistrate Judge** at 4 [#280], filed August 18, 2017.) As a sanction for this spoliation, I indulged the following adverse inferences in favor of the CFTC:

> a. That the spoliated documents would have demonstrated that all defendant's marketing materials were in fact disseminated or made available to customers or potential customers;
>
> b. That the spoliated documents would have demonstrated that defendant sent each of his marketing e-mails to numerous recipients using mass distribution lists, in which defendant collected tens of thousands of e-mail addresses;
>
> c. That the spoliated documents from defendant's e-mail accounts were consistent with the non-spoliated documents the Commission was able to obtain from those accounts, *i.e.*, if defendant's spoliation had not occurred, there would be still more examples of defendant's use of his e-mails accounts to conduct Emini Trading School ("ETS") business from at least 2009 through January 2015, including, among other things, evidence of (1) the marketing and sale of ETS products and services; (2) communications with customers individually; and (3) customer feedback about the products;

d.  That the spoliated documents, including transcripts of ETS trading room sessions and other documents from Webinato (i.e., Omnovia) and Citrix, would have demonstrated that, beginning at least as early as 2009 and continuing through at least July 2015, defendant operated the ETS Trading Room in a manner consistent with that shown in transcripts the Commission obtained; and

e.  The spoliated documents, including sales records and other documents from defendant's e-mail accounts, would have demonstrated that defendant had many more customers and sales than what is reflected in the documents that were not destroyed.

(*Id.* at 6.)

### 4.  Statements to the CFTC

In April 2015, during the investigative phase of this case, defendant gave a deposition to the CFTC.  Both in response to document requests issued in October 2014 in connection with that deposition and during the deposition itself, defendant made certain statements, either personally or through counsel, which the CFTC charges were materially false or misleading.  These statements make up Count IV.

By its October 2014 request, the CFTC requested, *inter alia*, copies "of each and every advertisement or marketing material, including but not limited to customer testimonials, used by you or your agents to market or advertise ETS in any manner." (Tr. Exh. 40 at 2.)

In response, defendant submitted three emails from customers, an alleged prototype "news, price and info update" email, and a zip file containing what purported to be a copy of the ETS website.  (Tr. Exh. 44.)

Defendant's counsel at that time, Robert Mackovski, explained the paucity of information by representing that defendant

> does not advertise in the traditional sense of the word. There are no magazine ads or buy placements or placing "ads" on other websites. My client gets prospective customers from search engines like google and yahoo. When people do a search on these search engines, the ETS website might come up; and if they click on the site link, they are brought to the website where they can then sign up for a free trial.

(Trial Exh. 44.)  At his deposition, defendant testified these representations were accurate.

In fact, defendant did place ads for ETS on other websites using Google's AdWords service and Yahoo's Marketing Solution service.  (*See* Tr. Exhs. 892 at 1, 895.)  Defendant placed ads for ETS on other websites, including Ninja Trader (Tr. Exh. 811), FX Platform (Tr. Exh. 813), and Trading Computers (Tr. Exh. 816).  Defendant also placed ads for AMPT on other websites.  (*See* Tr. Exhs. 797; 794 at 1.)

Most of defendant's AdWords records for ETS were lost when defendant deleted all emails in his ETS account.  The CFTC previously was granted an adverse inference against defendant as a result of this spoliation.  (*See* **Order Re: Objections to Recommendation of United States Magistrate Judge** ¶ 5.c(1) at 6 [#280], filed August 18, 2017.)

Defendant also failed to reveal to the CFTC (a) that he had a cross-promotion arrangement with Ninja Trader, whereby he would place ads for that company on ETS's website in return for Ninja Trader placing ETS ads on its website (Tr Exhs. 891, 811, 886); (b) that he placed presentations about ETS on other websites (Tr. Exhs. 784, 870,

878, 887); (c) that he issued press releases about ETS through PRWeb (Tr. Exh. 3 at 362, 524; Exh. 815).

Questioned at his deposition as to why he had produced but a single "prototype" email, defendant claimed he "ha[d]n't really sent anything out lately" (Tr. Exh. 3 at 199), that he didn't "have stuff anymore," and that he "ha[d]n't had any sales" since the previous September (Tr. Exh. 3 at 213-232).

In fact, defendant had sent numerous marketing emails between October 2014 and January 2015 alone.  (*See, e.g.*, Tr. Exhs. 872, 888.)  In September 2014, he sent out over 250,000 marketing emails. (Tr. Exh. 888 at 26.)  After his deposition, and in response to a deficiency letter sent by the CFTC (Tr. Exh. 57), defendant produced three additional marketing emails from the greg@eminitradingschool.com account (Tr. Exh. 58, 461, 464, 469).

In response to the CFTC's questions regarding other potential sources of communications with customers and prospective customers, defendant also failed to identify email accounts other than the greg@eminitradingschool.com account.  (Tr. Exh. 3 at 185-186.)  In fact, defendant maintained no less than five other email accounts for ETS.  (*See* Tr. Exhs. 896, 897 (spsafe@aol.com); 456, 657 (mptradermp@ hotmail.com); 429, 854 (info@asktraderworld.com); 401, 476 (ask@ askmarketprofiletrading.com); 874, 881 (mechanicaltrader@aol.com)).  At least two of these –  ask@askmarketprofiletrading.com and info@asktraderworld.com – were used to communicate with customers.  (*See* Tr. Exhs. 429, 530.)

Similarly, defendant named omNovia as the only service provider used in his trading room, failing to mention that Citrix was another such service provider which had hosted the trading room in 2013 and 2014.  (Tr. Exhs. 3 at 185-186; 62 at 9; 883.)

Defendant also failed to disclose that he interacted with potential customers thought presentations about ETS on other trading websites.  (*See* Tr. Exhs. 784 (Trader Central); 864, 867-869, 870 at 193, 871 (Mirus Futures); 878 (OnLine Trader Central); 887 (Trading Pub).)  Nor did he disclose his use of press releases to market ETS (Tr. Exhs. 3 at 362, 524; 815) as well as promotional videos posted on YouTube and Vimeo (which in turn were embedded in the ETS website and disseminated via email (Tr. Exhs. 510, 668, 724).

During his deposition, defendant testified his email marketing database did not contain many addresses and that he sent emails to only 100 to 150 recipients.  (Tr. Exh. 3 at 233, 355-356.)[10]  At a hearing before this court on the CFTC's request for an asset freeze, defendant admitted his database in fact had 40,00 to 65,000 email addresses and that he had sent marketing emails to approximately 10,000 recipients.  (Tr. Exh. 107 at 47.)  During discovery, he later amended the number of recipients to "about 12,000."  (Tr. Exh. 70 at 5.)

Defendant testified he did not "call trades" (an issue relevant to whether he could be considered a CTA) and consistently told customers he was not a trade caller.  (Tr. Exh. 3 at 259-260.)  When representatives of the CFTC confronted him with evidence to

---

[10]  Defendant maintained he had not produced this list to the CFTC because none of the people on it were customers.  (Tr. Exh. 3 at 198-199.)  At a later deposition taken in connection with the CFTC's request for sanctions as a result of defendant's spoliation, he testified the list comprised 150 to 200 customers.  (Tr. Exh. 6 at 322, 324-325.)

the contrary (***see, e.g.***, Tr. Exhs. 527, 530, 627 at 127, 640 at 58), defendant suggested he was being "sarcastic" when he told customers he was "done calling trades" (Tr. Exhs. 3 at 261, 512; 628 at 4).

In its January 2015 subpoena, the CFTC asked for all documents substantiating a statement found on defendant's website: "Most traders have made enough on one trade to pay for the monthly subscription." (Tr. Exh. 55 at 9.) Through counsel, defendant denied knowledge of any such statement being posted on his website and claimed ETS did not rely on the statement in its marketing. (Tr. Exh. 3 at 403.) At his subsequent deposition, defendant testified he did not write or post the statement and that it "sound[ed] like something a customer wrote" on an open blog that once existed on the website. (***See*** Tr. Exh. 3 at 111-117.)

Defendant has never corroborated his suggestion that the statement was posted by a customer, and nothing in the evidence indicates customers are or have ever been able to post content on the ETS website. Moreover, this exact statement appears in dozens of ETS marketing emails. (***See*** Tr. Exhs. 151-153, 155, 157, 159-164, 166-179, 181-183, 187-198, 200-201, 203-205, 207, 210-211, 214-221, 223, 225-226, 229-230, 470, 473, 476, 478-485.)

At his deposition, defendant testified that AMPT was "never really . . . in operation" and that he "never really got any sales from it." (Tr. Exh. 3 at 296, 304-305.) He also failed to identify AMPT in an interrogatory requesting he "[i]dentify and describe all businesses owned, operated, or managed by you," i.e., "activity that is intended to or does produce income." (Tr. Exhs. 66 at 1, 3; 70 at 3.) Instead, he insisted AMPT was merely a website designed to drive business to ETS. (Tr. Exh. 72 at 3.)

27

In fact, defendant had established AMPT in January 2011. Defendant established a website for AMPT, which featured a dedicated order form and a PayPal link, and hired an employee to assist with operations. (*See* Tr. Exhs. 136, 770, 846, 850, 884.) AMPT had an account with Google AdWords for which defendant paid a monthly fee to promote AMPT in text and mobile ads. (Tr. Exh. 794.) He sent out marketing emails on behalf of AMPT and gave marketing presentations promoting the company (Tr. Exhs. 783, 884, 855).

The marketing materials for AMPT contain statements identical or similar to those identified in connection with ETS above, including representations about the number of "winning days" users of the system could experience and how many winning days the plan had produced, and testimonials and hypotheticals that lacked the disclosures required both by the rules and the 2001 Order (Tr. Exhs. 163, 476.)

Confronted with evidence that AMPT was indeed a separate company and not simply a front to funnel business to ETS, defendant at first doubled down, insisting he had "no idea what [AMPT] is as an entity, or how you determined that it is/was a business." (Tr. Exh. 72 at 3.) Subsequently, he acknowledged that he in fact does receive revenues from AMPT. (Tr. Exh. 6 at 122.)

In his April 2015 deposition, defendant was asked to identify who worked on, posted content on, or otherwise had access to his website in the previous five years. In responding, defendant failed to name an entity called G4 DesignHouse ("G4"), which had posted content on and had access to defendant's website just one month prior to the deposition. Defendant had been in contact with G4 just one week prior to his testimony.

28

G4 also was developing a website for a new trading business defendant was developing called Ask Trader World ("ATW"). Defendant's failure to reveal his association with G4 prevented the CFTC from discovering G4 during the course of its investigation. The CFTC did not learn of defendant's association with G4 until defendant gave a deposition in connection with the CFTC's spoliation motion in this case.

In response to a January 2015 subpoena, defendant was asked to identify "all employees, agents, contractors, partners, owners, [and] managers of ETS from January 1, 2011 to the present." (Tr. Exh. 77 at 10.) Although claiming to have no documents relevant to this request, defendant, through counsel, identified two such individuals – Stephen Ferrin and James Petre. (Tr. Exh. 62 at 3.)

At his subsequent deposition, however, and after being confronted with names of additional past employees, defendant named three other individuals who had worked for ETS. (Tr. Exh. 3 at 203-207.) A week after the deposition, defendant's counsel sent the CFTC a list of five past employees who were not disclosed in his previous answer to the CFTC's subpoena. (Tr. Exh. 59.) Three of those individuals had worked for ETS more recently than Mr. Ferrin. All three had eminitradingschool.com email addresses.

As part of its October 2014 investigative request, the CFTC asked defendant to produce copies of all advertisements and marketing materials used to market ETS. Unbeknowst to defendant, the CFTC had preserved a copy of his website prior to making this request. (*See* Tr. Exh. 638, 640.)

As shown in that document, at the time of the CFTC's request, the website's

disclosures were displayed in scroll boxes at the bottom of the screen, which rendered only the first four lines of the disclosure visible unless a user actually scrolled through to the end of the text.  (*See* Demonstrative Exh. 912 at 3.)  In the version of the website defendant produced to the CFTC, the scroll box had been omitted.  (Demonstrative Exh. 912 at 4.)

The text of the disclaimer also had been expanded and altered, particularly to emphasize more strongly the risks involved in futures trading.  Specifically, defendant (a) added a proviso that ETS's products and services "are for informational, illustrative and educational purposes only and are not to be construed as specific advice"; (b) added a disclaimer suggesting defendant was not providing "an advisory service or any type of financial advice"; and (c) modified a statement that futures trading "has large potential rewards, but also large potential risk" to instead state that trading "involves high risks with the potential for substantial losses."  (*See* Demonstrative Exh. 912 at 3-4, 7-8.)

These modifications strengthened the previous disclosures, bringing them more in line with the requirements of the CEA and the 2001 Order.  Defendant later acknowledged he made them to "mak[e] sure that my disclaimer was correct."  (Tr. Exh. 6 at 309-310.)

Defendant did not preserve the prior version of the website before overwriting it, claiming he did not know how to do so.  (Tr. Exh. 6 at 310.)  He did not inform the CFTC that he had made these modifications and represented that he was producing "all files." (Tr. Exh. 44.)  Moreover, in his April 2015 deposition, he claimed he had made no

changes to the website "lately" (Tr. Exh. 3 at 249-250) and suggested the disclosures had been posted by the webmaster "years and years" earlier (Tr. Exh. 3 at 159).[11]

### 5. 2016 Merits Deposition and Invocation of Fifth Amendment Privilege

During his November 2016 deposition regarding the merits of this case, defendant repeatedly invoked his Fifth Amendment privilege and refused to answer questions.[12] In particular,[13] defendant refused to provide testimony concerning:

> a. Marketing claims about his system's performance, including questions about customer results and whether his system was "tested" (*see* Tr. Exh. 7 at 556-558, 561-563);
>
> b. Marketing claims regarding his trading system's predictive ability (*see* Tr. Exh. 7 at 570-573);
>
> c. His use of aliases in connection with ETS and failure generally to acknowledge to customers the prior fraud charges settled by the 2001 Order (*see* Tr. Exh. 7 at 492-494);
>
> d. His failure to disclose that the results he advertised were hypothetical rather than actual (*see* Tr. Exh. 7 at 515);
>
> e. His assertion that he was not a trade-caller and did not call, recommend, or otherwise advise trades (*see* Tr. Exh. 7 at 525-537);
>
> f. His April 2015 deposition testimony suggesting that his email marketing database did not have many names and that he had used it to send marketing emails no more than 100 to 150 people (*see* Tr. Exh. 7 at 579-581);

---

[11] Elsewhere, defendant affirmatively averred that he had made the disclosures changes. (*See* Tr. Exh. 70 at 4.)

[12] As a basis for his invocation of the privilege, defendant cited, *inter alia*, information produced in discovery indicating that the CFTC had communicated with the United States Attorneys for the District of Colorado and the Northern District of Illinois about this case. (*See* Tr. Exh. 7 at 454-455.)

[13] Consistent with maintenance of the privilege, defendant invoked the privilege as to every question asked of him during the more than three hours of the deposition.

g.  His failure to disclose the existence of email accounts other than the greg@eminitradingschool.com as well as other avenues by which he communicated with existing and prospective customers during his April 2015 deposition (*see* Tr. Exh. 7 at 593-595);

h.  His failure to disclose the names of certain former employees of ETS and AMPT during his April, 2015 deposition (*see* Tr. Exh. 7 at 590-593); and

i.  His denial that he made a specific performance claim on his website or used such a claim in marketing ETS (*see* Tr. Exh. 7 at 586-589).

## II.  CONCLUSIONS OF LAW

The CFTC brings four claims against defendant in this lawsuit: (a) fraud by a Commodity Trading Advisory pursuant to 7 U.S.C. §§ 6*o*(1)(A) & (B); (b) failure to disclose prominently the information required by 17 C.F.R. §§ 4.41(a)(3) and 4.41(b) when posting customer testimonials and hypothetical trading results, respectively; (c) violations of the 2001 Order; and (d) making false statements to the CFTC, in violation of 7 U.S.C. § 9(2).  Before examining the issues implicated by these claims, I address some preliminary matters.

### A.  Fifth Amendment Privilege & Adverse Inferences

Given defendant's refusal to testify on the matters identified in paragraph I.B.5. above, the CFTC has requested the court draw adverse inferences that defendant's testimony as to each of these matters would have been favorable to the CFTC.

"[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them[.]"  ***Baxter v. Palmigiano***, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d

810 (1976). When a party invokes his privilege against providing potentially self-incriminating testimony in a civil case, it is not inappropriate "to draw whatever inference from his silence that the circumstances warrant[]." *Id.* Nevertheless, "[t]he *Baxter* holding is not a blanket rule that allows adverse inferences to be drawn from invocations of the privilege against self-incrimination under all circumstances in the civil context," but instead must be resolved based on the particular facts and circumstances of each case. *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000).

In particular, "although inferences based on the assertion of the privilege are permissible, the entry of judgment based only on the invocation of the privilege and without regard to the other evidence exceeds constitutional bounds." *LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 391 (7th Cir. 1995) (citation and internal quotation marks omitted). There thus must be some independent evidence of the fact sought to be established by the inference. *See Rudy-Glazner*, 232 F.3d at 1264. *See also Securities and Exchange Commission v. Smart*, 2011 WL 2297659 at *18 (D. Utah June 6, 2011) (adverse inference appropriate where "undisputed evidence" established defendant was person responsible for fraudulent scheme), *aff'd*, 678 F.3d 850 (10th Cir. 2012); *Sanchez v. Brokop*, 398 F.Supp.2d 1177, 1183 (D.N.M. 2005) ("[A]dverse inferences may be drawn against a party who refuses to testify in response to probative evidence offered against them."); *DirecTV, Inc. v. Lovejoy*, 366 F.Supp.2d 132, 139 (D. Me. 2005) (noting that *Baxter* itself found adverse inference appropriate in circumstance where defendant "was silent 'in the face of evidence that incriminated him' and his silence was given 'no more evidentiary value than was warranted by the facts

surrounding the case'") (quoting **Baxter**, 96 S.Ct. at 1558).

That precondition to an entitlement to adverse inferences is satisfied here. As to each of the topics identified in paragraph I.B.5., and as described in more detail below, the CFTC has submitted independent evidence corroborating the existence of the facts regarding which defendant refused to answer.

The CFTC disputes whether it must prove additionally a substantial need for the information which cannot be obtained through any less burdensome means, claiming no such requirement has ever been imposed by the Tenth Circuit. **Cf. Rudy-Glazner**, 232 F.3d at 1265; **Serafino v. Hasbro, Inc.**, 82 F.3d 515, 518 (1st Cir. 1996). (**See Order Re: Objections to Recommendation of the United States Magistrate Judge** at 3 n.2 [#282], filed August 23, 2017.) Of course, the Tenth Circuit's silence on the issue does not portend that it would refuse to impose such a requirement were the issue presented to it directly.

Nevertheless, I need not reach the issue because that condition is satisfied here. While one might question whether defendant's testimony is necessary to corroborate the mountains of documentary evidence admitted in evidence in this case, the fact remains that defendant – the lone creator and developer of the ETS trading system and the driving force behind its promotion and execution – is the sole, definitive source of information regarding many of the details which tend to show his own state of mind. His silence in the face of strong and voluminous evidence suggesting forcefully that he made materially false or misleading statements or omission in the marketing of his product and in his interactions with the CFTC is properly considered.

Moreover, as the trier of fact, I do not give any such inferences more weight than is warranted by the other facts which are proven by the documentary and testamentary evidence.  ***See Nationwide Life Insurance Co. v. Richards***, 541 F.3d 903, 913 (9th Cir. 2008).  I therefore will indulge the adverse inferences as to the matters set forth above in paragraph I.B.6.

## B.  SUBSTANTIVE LEGAL CLAIMS

### 1.  Count I:  Violations of the Commodities Exchange Act, 7 U.S.C. §§ 6*o*(1)(A) & (B)

In interpreting and applying the CEA, courts "are guided by the principle that the CEA is a remedial statute that serves the crucial purpose of protecting the innocent individual investor – who may know little about the intricacies and complexities of the commodities market – from being misled or deceived."  ***Commodity Futures Trading Commission v. R.J. Fitzgerald & Co.***, 310 F.3d 1321, 1329 (11th Cir. 2002), ***cert. denied***, 125 S.Ct. 808 (2004).  ***See also R&W Technical Services, Ltd. v. Commodity Futures Trading Commission***, 205 F.3d 165, 173 (5th Cir.) (noting Congress gave the CFTC broad enforcement powers "in part because of the fear that unscrupulous individuals were encouraging amateurs to trade in the commodities markets through fraudulent advertising"), ***cert. denied***, 121 S.Ct. 54 (2000).

Section 6*o* of Title 7, United States Code, provides, in relevant part:

(1) It shall be unlawful for a commodity trading advisor . . . by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly –

    (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or

    (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

7 U.S.C. § 6*o*(1).

### a. Violations of section 6*o*(1)(B)

To prove a cause of action under section 6*o*(1)(B), the CFTC must prove by a preponderance of the evidence that defendant (a) acting as a CTA; (b) made misrepresentations, misleading statements, or omissions; (c) which were material; (d) in connection with the purchase or sale of a commodity. ***United States Commodity Futures Trading Commission v. Emini Experts, LLC***, 2016 WL 7666148 at *4 (M.D. Fla March 29, 2016), ***adopted***, 2016 WL 3098199 (M.D. Fla June 3, 2016). ***See also Commodity Futures Trading Commission v. Schafer***, 1997 WL 33547409 at *5, *8 (S.D. Tex. Dec. 23, 1997) (noting that elements under section 6*o* are identical to those under section 6b(a)(ii) and track the elements of a common law action for fraud).[14]

---

[14] However, "[u]nlike a cause of action for fraud under the common law of Torts, 'reliance' on the representations is not a requisite element in an enforcement action." ***R.J. Fitzgerald & Co.***, 310 F.3d at 1328. ***See also Affiliated Ute Citizens v. Utah v. United States***, 406 U.S. 126, 153, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972).

The first and last of these elements are easily satisfied. I previously determined that defendant is a CTA.[15] (*See* **Order Re: Objections to Recommendation of the United States Magistrate Judge** at 2-5 [#273], filed July 31, 2017.) Moreover, the parties do not dispute, and it appears eminently clear, that all statements and omissions on which the CFTC seeks judgment were made in connection with the purchase or sale of a commodity.

The second and third elements are interrelated and contemplate proof of a misrepresentation, whether by commission or omission, which is material. "Whether a misrepresentation has been made depends on the 'overall message' and the 'common understanding of the information conveyed'" to the objectively reasonable customer or client.[16] **R.J. Fitzgerald & Co.**, 310 F.3d at 1328-29 (citation omitted).

In addition to statements of fact which are facially false, "statements of opinion or belief must rest on 'a factual basis that justifies them as accurate.'" **Grossman v. Novell, Inc.**, 120 F.3d 1112, 1123 (10th Cir. 1997) (quoting **Virginia Bankshares v. Sandberg**, 501 U.S. 1083, 1093, 111 S.Ct. 2749, 2758, 115 L.Ed.2d 929 (1991)). Relatedly, a statement also is considered false or misleading where the speaker omits "important factual caveats." **United States Commodity Futures Trading Commission**

---

[15] That is, defendant is a person who, *inter alia*, "for compensation or profit, engage[s] in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in – (i) any contract of sale of a commodity for future delivery." 7 U.S.C. § 1a(12)(A)(i)(I). As such, defendant must comply with section 6*o*(1), regardless whether he was actually registered, required to be registered, or exempted from registering. **Commodity Futures Trading Commission v. Wall Street Underground, Inc.**, 281 F.Supp.2d 1260, 1269 (D. Utah 2003), **aff'd**, 128 Fed. Appx. 726 (10th Cir. April 27, 2005).

[16] The inclusion of "a general risk disclosure statement does not automatically preclude liability under the CEA where the overall message is clearly and objectively misleading or deceptive." **R.J. Fitzgerald & Co.**, 310 F.3d at 1330.

*v. R2 Capital Group, LLC*, 2017 WL 4350366 at *8 (D. Colo. Aug. 3, 2017), **appeal dismissed**, 2017 WL 8751969 (10th Cir. Nov. 14, 2017).  **See also** W. Page Keeton et al., **Prosser and Keeton on Torts** § 106 at 738 (5th ed. 1984) ("[H]alf of the truth may obviously amount to a lie, if it is understood to be the whole.").

A  false or misleading statement or omission is "'material' if a reasonable investor would consider it important in deciding whether to make an investment."  **R.J. Fitzgerald & Co.**, 310 F.3d at 1328-29.  **See also United States Commodity Futures Trading Commission v. Trimble**, 2013 WL 317576 at *6 n.5 (D. Colo. Jan. 26, 2013).

The preponderance of evidence cited herein, together with the adverse inferences properly drawn from defendant's silence in the face of questioning about that evidence, demonstrate defendant made materially false and misleading statements,  or omitted material facts.  Specifically, defendant made false or misleading statements or omissions regarding the following:

**(1) The performance, profitability, and results achieved or achievable using the ETS trading system.**

Defendant made numerous misrepresentations of his own performance, profitability, and results, as well as those of purported customers, in using his system.[17] His marketing materials suggested defendant, by using the ETS trading system, was able to live a comfortable (perhaps even lavish) lifestyle.  He promised trading with his

---

[17]  Defendant's suggested (but largely undeveloped) argument that there is a difference between his customers and the "clients or participants" to whom section 6o applies is specious.  (**See Def. Trial Br.** At 9-10 [#330], filed February 20, 2018.)  A "client" includes any person "[t]o whom a commodity trading advisor provides advice, for compensation or profit, either directly or through publications, writings, or electronic media, as to the value of, or the advisability of trading in, any contract of sale of a commodity for future delivery . . ."  17 C.F.R. § 1.3.  That description plainly describes defendant.

system would allow customers a similar level of economic autonomy, living where they wanted and working just a few hours a week for incredible rewards at little risk.

For example, defendant repeatedly represented that his system employed a "winning" strategy which gave users the ability to "win" "every day" in the market. Defendant further claimed the ETS system was 90 to 95 percent accurate and could predict trades "to the tick." He likened the system to having a "crystal ball." Relatedly, defendant's claims that he had "won" in the markets on particular occasions plainly implied that he had made an actual, profitable, real-money trade that day.

Such statements constitute representations of profitability. *See Commodity Futures Trading Commission v. Heffernan*, 245 F.Supp.2d 1276, 1295 (S.D. Ga. 2003) ("[I]ndeed, were this not the intent behind the publication of the statistics, there would be little reason to advertise them.").

Those statements, however, were false. The evidence plainly shows defendant did not "win" (i.e., realize a profit on a commodity trade) every day, or even most days, using the ETS system. Indeed, there were many days on which he claimed to have had a "winning" day when he had not traded at all. On other days, although he technically realized a "win," his profit was *de minimis* or offset by losing trades. (*See* Tr. Exhs. 147, 148; Tr. Transcript (Day 1) at 158-173.)

Misrepresentations of profit plainly are material. *R.J. Fitzgerald & Co.*, 310 F.3d at 1332-33; *Commodity Futures Trading Commission v. Wall Street Underground, Inc.*, 281 F.Supp.2d 1260, 1269-70 (D. Kan. 2003), *aff'd*, 128 Fed. Appx. 726 (10th Cir. April 27, 2005); *Heffernan*, 245 F.Supp.2d at 1295. Indeed, the potential profits to be

realized are the key piece of information a customer would find relevant in deciding whether to purchase the ETS system.

Because "simulated results inherently overstate the reliability and validity of an investment system," a statement, whether direct or implicit, that trades are performed using real money is material. ***R&W Technical Services Ltd.***, 205 F.3d at 170. "[A] reasonable investor would regard as material the fact that the petitioners' trading system had never been tested through actual trading. . . . If real money is used in testing, . . . investors can have more confidence in the seller's claims." ***Id.*** at 169-70 (citation, internal quotation marks, and footnote omitted). ***See also Heffernan***, 245 F.Supp.2d at 1295 ("Courts have recognized that the failure to disclose information that a performance record does not represent the results of actual trading but of hypothetical or fictitious trading is a violation of section 4$o$(1).") (citation and internal quotation marks omitted). Mr. Ratica confirmed the materiality of such statements in his testimony. (***See*** Tr. Transcript (Day 1) at 68.)

Moreover, defendant's silence in response to questions about these matters in the face of the overwhelming evidence suggesting the falsity of his statements justifies an adverse inference that these claims were baseless, and known by defendant to be so.

Accordingly, defendant violated section 6$o$(1)(B) in making these claims.

**(2) Risks inherent in trading.**

The same lack of substantiation of defendant's claims of profit, predictability, and performance of the ETS system also renders defendant's representations of the risks of

trading using the system misleading.  Defendant's own losing trading record belied his statements that his system carried high risk-reward ratios.  His suggestion that the system's use of "stops" limited customers' risks also was false, as the ETS system did not employ automatic stops.

That defendant peppered the pages of his websites with risk disclosure statements (which in any event were incomplete and non-obvious, and thus violated the CEA and the 2001 Order, as discussed in more depth below) does not absolve him of liability.  "[A] general risk disclosure statement does not automatically preclude liability . . . where the overall message is clearly and objectively misleading or deceptive." *R.J. Fitzgerald & Co.*, 310 F.3d at 1330.  The overall message of defendant's marketing communications were designed to minimize a potential customer's focus on the risks of trading.

Congress enacted the CEA specifically to mitigate the inherently risky nature of futures trading.  *See R.J. Fitzgerald & Co.*, 310 F.3d at 1334.  Misrepresentations of those risks thus run counter to the very essence of the law and are material as a matter of law.  *See Wall Street Underground*, 281 F.Supp.2d at 1270 ("[M]isrepresentations concerning profit and risk go to the heart of a customer's investment decision and are therefore material as a matter of law.") (citation and internal quotation marks omitted). *See also R.J. Fitzgerald & Co.*, 310 F.3d at 1333 ("It is misleading and deceptive to speak of 'limited risk' and '200-300' percent profits without also telling the reasonable listener that the overwhelming bulk of firm customers lose money.").

Accordingly, defendant's various statements regarding the risks of using the ETS system violated section 6*o*(1)(B).

**(3) Concealment of defendant's identity.**

Defendant's failure to use his full name when interacting with customers also constitutes a materially misleading omission. The omission of that information made it virtually impossible for customers and potential customers to discover the CFTC's prior trading fraud charges against defendant. ***Commodity Futures Trading Commission v. Gibraltar Monetary Corp.***, 2006 WL 1789018 at *15 (S.D. Fla. May 30, 2006), ***aff'd***, 575 F.3d 1180 (11th Cir. 2009).

Such information plainly would have been material to anyone considering whether to invest thousands of dollars in defendant's futures trading system. ***Id.*** at *17; ***Heffernan***, 2006 WL 2434015 at *5 n.39, *7.

Defendant's refusal to provide any testimony regarding his use of aliases in connection with ETS and general failure to make customers aware of his prior fraud charges or the existence of the 2001 Order justifies an adverse inference that he did so knowing disclosure would be harmful to the success of ETS.

Thus, defendant's failure to disclose his identity constituted a materially misleading omission in violation of section 6*o*(1)(B).

**(4) Functionality of the ETS system.**

Lastly, defendant consistently misrepresented the functionality of his trading system. He claimed his system was easy to learn and included automatic features which would take the thinking out of trading. He claimed the system directed customers

where to place price stops and when to exit a trade profitably. More generally, he represented his products as user-friendly and his system as easy to figure out and employ.

The evidence presented at trial plainly shows none of these representations to be true. The ETS trading plan ran to over 60 pages, even before handwritten additions were sent out. Defendant himself could not consistently identify how many "day types" his program included, and was forced to concede that he had not mastered the plan.

The trade room itself was a visually cluttered mass of colored bars, solid and dotted lines, and text boxes, made all the more incomprehensible by defendant's narration of what he purportedly was doing with various trades at any given point in time. Customers who had some understanding of what all the lines and bars meant, like Mr. Ratica, found the program essentially worthless. Those who were less sophisticated, like Mr. Durant, actually lost money using the system.

In addition, part of the alleged ease of the system was the representation that it included automatic stops. It did not.

These misrepresentations also were material. The alleged ease of use of the system undoubtedly would have been a major, if not the main, consideration for new and unsophisticated traders in deciding whether to purchase the program..

For these reasons, defendant's representations about the ease and functionality of the ETS system constitute violations of section 6*o*(1)(B).

### b. Violations of section 6*o*(1)(A)

The elements of proof of a cause of action under section 6*o*(1)(A) are identical to those establishing a cause of action under section 6*o*(1)(B), except that proof of scienter also is required. **See Messer v. E.F. Hutton & Co.**, 847 F.2d 673, 677-78 (11th Cir. 1988) (noting that subsection (1)(A) is analogous to the antifraud provisions of section 17(a)(1) of the Securities Act and thus requires same proof of scienter as required to prove violation of section 10(b) and Rule 10b-5 of the securities laws).

Thus, the facts set forth above in relation to defendant's violations of section 6*o*(1)(B) also establish the first four elements of the CFTC's claims for violations of 7 U.S.C. § 6*o*(1)(A).

As for scienter, it "is established when an individual's conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that defendant must have been aware of the risk." **Trimble**, 2013 WL 317576 at *6 n.4 (citing **R.J. Fitzgerald & Co.**, 310 F.3d at 1328). Mere negligence, mistake, or inadvertence is insufficient; "willful or fraudulent action is required for recovery." **Hill v. Bache Halsey Stuart Shields Inc.**, 790 F.2d 817, 822 (10th Cir. 1986) (citation and internal quotation marks omitted).

That standard is more than satisfied here. The evidence presented demonstrates plainly that defendant made or endorsed numerous material false or misleading statements or omissions about the attributes of his system over a period of many years. These were not momentary lapses, clerical errors, or inadvertent misstatements. The risks of misleading customers were inherent in the hyperbolic

44

claims defendant made – indeed, it appears to this court defendant made these claims with the specific aim of luring in unsophisticated nascent traders who would be dazzled by his claims of easy riches and limited risk exposure.

Moreover, given that defendant had already been made aware of the illegality of similar (and in many cases identical) claims and representations by virtue of his agreement to entry of the 2001 Order, he cannot credibly suggest he made these statements unintentionally, negligently, or otherwise innocently.

Defendant's failure to testify adds further ballast to this conclusion, and I draw adverse inferences as to all the misrepresentations and omissions which have been brought to light by the CFTC in this trial. Together with the independent corroborating evidence of the blatant falsity of defendant's various representations about his system's functionality and profitability and his own expertise in futures trading, I have no trouble in finding defendant made such material misrepresentations and omitted such material facts knowingly or with reckless disregard of their truth or falsity.

Accordingly, the CFTC is entitled to judgment against defendant on its claims under section 6*o*(1)(A) as well.

### 2. Count II: Violations of 17 C.F.R. § 4.41

17 C.F.R. § 4.41(a)(3) makes it unlawful for any CTA to refer to a testimonial in an advertisement unless the advertisement "prominently discloses" that: (i) "the testimonial may not be representative of the experience of other clients," and (ii) "the testimonial is no guarantee of future performance or success."

17 C.F.R. § 4.41(b) makes it unlawful for any person to "present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity

interest or series of transactions in a commodity interest of a . . . [CTA], or any principal thereof, unless such performance is accompanied by" required warning language.

These provisions apply to any publication, writing, advertisement, or other literature or advice, made by electronic media or otherwise, including information provided through the Internet or email. 17 C.F.R. § 4.41(c)(1).

I have already determined that defendant is a CTA and that, with respect to a number of marketing emails and pages of his website, he failed to provide the disclosures required by these regulations. (*See* **Order Re: Objections to Recommendation of the United States Magistrate Judge** at 6-7 & ¶ 3.a. at 11 [#273], filed July 31, 2017.)[18]

Defendant acknowledged the trading results he advertised in his marketing emails and videos and on his website were not based on transactions actually executed in the marketplace. (*See* Tr. Exh. 3 at 85.) All such results therefore were hypothetical or simulated. *See In re Armstrong*, 1995 WL 108992 at *10 (CFTC March 10, 1995).

At trial, the CFTC proved further evidence of additional instances in which defendant's disclosures were insufficiently prominent and/or proximate to the testimonial or hypothetical returns to which they applied.

Since at least 2010, the ETS website touted hypothetical trading results (*see* Tr. Exhs. 640 at 72, 209, 227; 651 at 15-16, 22–23, 25-27, 42-45; 652 at 28–32) and included testimonials (*see* Tr. Exhs. Ex. 640 at 36-40; 650 at 23-26; 651 at 36-39; 652

_____

[18] These communications are found in what are marked for purposes of trial as Trial Exhibits 347; 429; 453; 456;. 458-459;. 461-462;. 464-469;. 479-482;. 485-486; 488;. 492–494; 496;. 499-502;. 507-510; 512; 640 at 32-33, 36-40, 50-51, 58-59, 76-77, 206-08, 212-20, 230-32, 242-47, 257-59; and 885.

at 23, 27–29, 31–32) which failed to satisfy the disclosure requirements.

The AMPT website also featured hypothetical trading results and testimonials without the required disclosures.  (*See* Tr. Exhs. 653 at 11-12; 654 at 15-17.)

In addition, a significant number of defendant's marketing emails (*see* Tr. Exhs. 152-153, 155, 157, 159, 162-165, 199, 203, 207, 222-223, 227, 229-230, 241, 249, 279, 280-281, 285-287, 291-294, 296-298, 306-307, 324, 328, 334-335, 341, 346, 348, 351, 353-354, 357-65, 368-371, 373-382, 392, 394-398, 400-405, 407, 410, 416-418, 421, 424-425, 427-428, 430-431, 434-437, 439-452, 454-455, 457, 472, 476, 484, 541)  and marketing videos (*see* Trial Exhs. 659, 661-672, 674-684, 687-688) also violated these provisions by failing to include adequate disclosures.

These additional instances of violations of the regulations regarding hypotheticals and testimonials adduced at trial are identical in all material respects to those for which I previously found defendant liable.

Accordingly, the CFTC is entitled to judgment in its favor on Count II as to these communications as well.

### 3.  Count III:  Violations of the 2001 Order

The 2001 Order restrained defendant from further violations of 7 U.S.C. § 6*o*(1)(B) and 17 C.F.R. § 4.41(b).  Because, as I conclude above, defendant subsequently did violate those provisions, the CFTC is entitled to judgment in its favor on its claim based on Part VII.1. of the 2001 Order.


The 2001 Order also constrained defendant from making certain specified

representations in advertising any "trading system" or "advisory service."  Although those terms were not defined in the Order itself, defendant's own expert witness, David Aronson, testified that a CTA by definition offers "advisory services."  (Transcript (Day 2) at 71.)  As noted previously, defendant is a CTA.

Defendant's rebuttal expert, Jack Schwager, who Mr. Aronson himself recognized as a noted expert in the relevant field (*id.* at 72), confirmed that defendant both advertised and provided "advisory services" (*id.* at 91-105).

I therefore conclude that defendant advertised an advisory service.

Based on the evidence recounted above, defendant violated Part VII.3.A. of the 2001 Order by misrepresenting in his advertising the performance, profits, and/or results that were or could be achieved by users, including himself, of ETS

Based on the evidence recounted above, defendant violated Part VII.3.A. of the 2001 Order by misrepresenting in his advertising the risks associated with trading pursuant to the ETS system.

Based on the evidence recounted above, defendant violated Part VII.3.B. of the 2001 Order by failing to include in his advertising the disclosure statements required by Rule 4.41(b) and failing to "clearly identify" that the advertised results were hypothetical or simulated.

Based on the evidence recounted above, defendant violated Part VII.3.C. of the 2001 Order by representing in his advertising the financial benefits associated with ETS without first disclosing, prominently and conspicuously, that futures trading involves high risks with the potential for substantial losses.

Based on the evidence recounted above, defendant violated Part VII.3.D. of the 2001 Order by making representations in his advertising for which he had no reasonable basis regarding (a) the performance, profits, or results that were or could be achieved by users, including himself, of ETS; (b) the risks associated with trading using ETS; and (c) that the experience represented by any user, testimonial, or endorsement of ETS was typical.

Lastly, and as set forth in more detail below, it is plain defendant violated Part VII.3.D. of the 2001 Order by (a) failing to maintain copies of all advertisements and promotional materials containing such representations and all materials that were relied on or otherwise substantiated such representations; and (b) failing to make such materials immediately available for inspection and copying by the CFTC on request. Defendant did not maintain copies of all his marketing materials; those he did retain were slow-walked to the CFTC during the course of this lawsuit and then generally only under pressure of court sanction.

Accordingly, the CFTC is entitled to judgment on Count III.

### 4. Count IV: Violations of 7 U.S.C. § 9(2), False Statements to the CFTC

In 2010, the CEA was amended to include a provision by which it is

> unlawful for any person to make any false or misleading statement of a material fact to the Commission . . . or to omit to state in any such statement any material fact that is necessary to make any statement of a material fact made not misleading in any material respect, if the person knew, or reasonably should have known, the statement to be false or misleading.

7 U.S.C. § 9(2).

To prove a cause of action under this section, the CFTC must show defendant

(1) made a false or misleading statement or omission; (2) of material fact; (3) to the CFTC; (4) which he knew or reasonably should have known was false or misleading. *See id.  See also United States Commodity Futures Trading Commission v. Arista, LLC*, 2013 WL 6978529 at *13 (S.D.N.Y. Dec. 3, 2013).  Each false or misleading statement constitutes a separate violation of the CEA. *See Commodity Futures Trading Commission v. Levy*, 541 F.3d 1102, 1110-11 (11th Cir. 2008).

Because the terms "false" and "misleading" are not defined in the CEA, they are construed as "commonly understood in the English language." *United States Commodity Futures Trading Commission v. Reed*, 481 F.Supp.2d 1190, 1199 (D. Colo. 2007).  Thus, a statement is actionable under this section when it is either literally untrue or when it fails to include all information necessary to give the recipient a complete and accurate picture of the state of affairs communicated.  *See Arista*, 2013 WL 6978529 at *7-9, *13.  Statements made to the CFTC by an attorney on behalf of a client are attributable to the client for purposes of section 9(2).  *See id.* at *7.

Subsequently recanting or correcting a false or misleading statement does not absolve the speaker of liability if that action was prompted only by the skepticism and further inquiry of the government.  *See In re Butterfield*, 2013 WL 9047200 at *2-3 (CFTC Sept. 16, 2013).  *See also United States v. Meuli*, 8 F.3d 1481, 1487 (10th Cir. 1993) (affirming conviction under 18 U.S.C. § 1001 for making false statements to the government because defendant amended false statements on IRS form only after he became aware that IRS was suspicious of those statements), *cert. denied*, 114 S.Ct.

1403 (1994).[19]

A statement or omission is material when it has "a natural tendency to influence, or [be] capable of influencing, the decision of the decisionmaking body to which it was addressed." ***United States v. Gaudin***, 515 U.S. 506, 509, 115 S.Ct. 2310, 2313, 132 L.Ed.2d 444 (1995) (citation and internal quotation marks omitted). It is not necessary to show the agency actually relied on or was influenced by the statement, ***United States v. Strohm***, 671 F.3d 1173, 1186 (10th Cir. 2011).

Likewise, it does not matter whether the CFTC knew the statement was false at the time it was made, *see **Butterfield***, 2013 WL 9047200 at *2-3, or conversely, whether it did not discover the falsity until later, *see **United States v. Parsons***, 967 F.2d 452, 455 (10th Cir. 1992) (rejecting argument that statements were not material because they "were so ludicrous no IRS agent would believe them").

A statement made to the Division of Enforcement during the course of an investigation, whether under oath, *see **Butterfield***, 2013 WL 9047200 at *3, in response to an investigative subpoena, ***Matter of Beatty***, 2014 WL 4965119 at *2 (CFTC Sept. 30, 2014), or voluntarily, ***In re Obolensky***, 2014 WL 795378 at *2 (CFTC Jan. 2, 2014), is a statement "made to the Commission."

Lastly, the CFTC must prove defendant knew or should have known his statements were false or misleading. Defendant's history and background inform that

---

[19] Title 18, section 1001 of the United States Code makes it a crime to "knowingly and willfully" make a "materially false, fictitious, or fraudulent statement or representation" "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." 18 U.S.C. § 1001(a)(2). Given the relative dearth of court-rendered (as opposed to administrative) decisions in section 9(2) prosecutions, cases involving section 1001 may be instructive, with the caveat that the CFTC's burden of proof in this civil case is far lesser than that required to impose criminal liability under section 1001.

determination, as do considerations of what a reasonable person would be expected to know in similar circumstances. **See In re Vaughn**, 463 B.R. 531, 542 (D. Colo. Bankr. 2011) (finding not credible suggestion that defendant did not know his tax return contained false information because he was a "sophisticated" and "savvy" businessman and should have identified "the numerous red flags associated with the transaction" reported on his tax return), **aff'd**, 2013 SL 1324377 (D. Colo. March 29, 2013), **aff'd**, 765 F.3d 1174 (10th Cir. Aug. 26, 2014), **cert. denied**, 135 S.Ct. 2919 (2015).

As set forth in my findings of fact, defendant, either personally or through his counsel, made numerous false representations to the CFTC either during or in connection with his April 2015 deposition. Specifically, defendant (or his counsel on his behalf) falsely stated to the CFTC:

> 1. That he did not "advertise in the traditional sense of the word," but instead relied on customers finding ETS through Google and other internet search engines;
>
> 2. That he had not sent out marketing emails between September 2014 and April 2015;
>
> 3. That his email marketing database contained no more than 100 to 150 recipients;
>
> 4. That he told customers he was not a trade caller;
>
> 5. That he was not responsible for the claim made on his website that "[m]ost traders have made enough on one trade to pay for the monthly subscription;" and
>
> 6. That AMPT was not a going concern and he had received no revenues from it.

Defendant knew or reasonably should have known these statements were false. Each of these statements is flatly contradicted by the evidence of record. Defendant

personally was almost entirely responsible for the operation and management of ETS and the content and promulgation of its advertising and marketing materials. It defies credulity to suggest defendant was unaware that these statements were false or was not responsible for their promulgation.

Moreover, defendant's failure to testify in light of the overwhelming independent evidence of his mendacity on these matters make it appropriate to indulge adverse inferences regarding his knowledge as to each of them.

Each of these statements has "a natural tendency to influence, or [be] capable of influencing" the CFTC's decisionmaking process in the conduct of its investigation, *Gaudin*, 115 S.Ct. at 2313, and therefore was material. Individually and collectively, they painted a picture of a much smaller, less robust business than actually existed, in an obvious attempt to minimize the extent of – if not negate entirely – defendant's flagrant violations of the CEA and the 2001 Order. The CFTC might have decided not to pursue the investigation further had defendant's violations, if any, been as *de minimis* as his false statements suggested.

Defendant also failed to inform the CFTC of the following facts:

> 1. That he advertised ETS through other means, such as by a cross-promotional arrangement with Ninja Trader, the placement of presentations on other websites; and the issuance of press releases;
>
> 2. That he communicated with customers through email accounts other than the greg@eminitradingschool.com account;
>
> 3. That the service provider Citrix had hosted the ETS trading room;
>
> 4. That G4 DesignHouse had access to and posted content

on defendant's website and was creating a website for a new
trading business defendant was developing;

5.  That at least five other individuals whom he did not reveal
prior to his deposition had worked for ETS; and

6.  That he had altered the copy of the website he produced
in response to the CFTC's October 2014 document request.

Defendant knew or reasonably should have known that these omissions caused
his statements to the CFTC to be misleading.  ETS was principally a one-man
operation.  Any suggestion that defendant did not know, for example, the names of
previous employees, the existence of other email accounts, or the name of the entity he
had engaged to work on the ETS website is not credible.[20]  He was forced to
acknowledge at his April 2015 deposition that he had altered his website after the CFTC
requested a copy in a blatant attempt to conceal his violations of the CEA and the 2001
Order.

The clear, independent evidence of defendant's concealment of these facts
makes it appropriate to draw adverse inferences regarding his knowledge as to each of
the above omissions.

These omissions were material.  Each of them has "a natural tendency to
influence, or [be] capable of influencing" the CFTC's decisionmaking process in the
conduct of its investigation.  *Gaudin*, 115 S.Ct. at 2313.  The revelation of other
advertising platforms, service providers, emails accounts, and employees would have
led to the discovery of additional evidence relevant to the CFTC's investigation.  The
failure to note the changes defendant made to the website before producing it gave the

---

[20]  To the extent he did not know, defendant certainly had both the means and the responsibility to
inform himself of those matters prior to his deposition.

false impression that the disclosures in the modified version had always been thus. Their concealment was made with the intent to curtail further investigation by the CFTC.

I thus find and conclude that the CFTC is entitled to judgment on its claims for violation of section 9(2) of the CEA as stated in Count IV.

### III. APPROPRIATE RELIEF

The CFTC requests relief in the form of civil monetary penalties, disgorgement, restitution, and injunctive relief.

### A. Civil Monetary Penalty

A separate civil monetary penalty may be imposed for each violation of the CEA which occurred within the statute of limitations. 7 U.S.C. §§ 13a-1(a), (d); 28 U.S.C. § 2462. The parties agree, and I concur, that the relevant period runs from October 19, 2010, five years before the filing of this lawsuit.

The penalty imposed consists of "the greater of $140,000 or triple the monetary gain to such person for each such violation." 17 C.F.R. § 143.8(a)(4)(i)(B)(4). *See also Levy*, 541 F.3d at 1110-11 (relevant unit is individual violation, not number of counts alleged in the complaint).

"Monetary penalties serve the dual functions of punishment and deterrence," *Securities and Exchange Commission v. Mantria Corp.*, 2011 WL 3439348 at *9 (D. Colo. Aug. 5, 2011) (citation and internal quotation marks omitted), and "act to vindicate these provisions in individual cases, particularly where the respondent has committed the violations intentionally," *United States Commodity Futures Trading Commission v. Gutterman*, 2012 WL 2413082 at *11 (S.D. Fla. June 26, 2012) (citation and internal

quotation marks omitted).  While the penalty must be "be rationally related to the offense charged or the need for deterrence," **Levy**, 541 F.3d at 1112, the penalty should be substantial enough to discourage other potential violators from likewise engaging in illegal conduct, **Gutterman**, 2012 WL 2413082 at *11.

In fashioning an appropriate civil monetary penalty, courts have found the following factors instructive:

> the seriousness of the violations as determined by the relationship of the violation to the regulatory purpose; whether the violation was an isolated mistake arising from an ambiguous statutory duty or from circumstances that are unique and unforeseeable; the particular mitigating or aggravating circumstances presented by the unique facts of the individual conduct at issue; any benefit to the violator; any harm to the investors; any attempt to cure the violations; post violation conduct; cooperation with authorities; and any attempt to provide restitution.

**Commodity Futures Trading Commission v. Brockbank**, 505 F.Supp.2d 1169, 1177 (D. Utah 2007), **aff'd**, 316 Fed. Appx. 707 (10th Cir. April 3, 2008), **cert. denied**, 129 S.Ct. 504 (2008) (footnote and internal quotation marks omitted).  **See also Mantria Corp.**, 2011 WL 3439348 at *9 (considering similar list of factors).

The violations found here are extremely serious.  Fraud goes to the very heart of the CEA.  **See Gutterman**, 2012 WL 2413082 at *11.  Violations of a CFTC Order likewise are especially grave.  The entire regulatory scheme established by the CEA could not function if CFTC orders – especially orders to which a defendant agreed in order to avoid trial, as here – are not respected.  Similarly, making false or misleading statements to the CFTC in the carrying out of its regulatory mission undermines the fabric of the law the agency is charged with enforcing.

The violations here are not isolated. Defendant's repeated violations of the statute and the 2001 Order went on for years. Moreover, they were strikingly similar, and in many cases identical, to those which gave rise to the 2001 Order.

Moreover, I reject defendant's arguments suggesting he believed in good faith that he was compliant with the terms of the 2001 Order and/or that the 2001 Order was limited in duration and scope. These arguments are not credible. The duties imposed by the 2001 Order were not ambiguous. Defendant instead made obvious attempts to split hairs and play semantics in an attempt to avoid the clear language of the 2001 Order. His actions in response to the CFTC's request for information likewise demonstrate he knew he was in violation of the law and the 2001 Order.

Defendant made no attempt to cure his violations. Indeed, his conduct of this litigation makes plain that he has attempted at every turn to stymie the efforts of the CFTC and the court to understand the full extent of his fraud. He has showed no remorse or contrition, but instead has attempted to avoid responsibility for his conduct, both past and present.

Defendant has never produced a full accounting of his business revenues, nor has he ever offered or attempted to make restitution. Given the clear nature of his violations of the CEA and the 2001 Order, his suggestion that this factor should be neutral (or count in his favor) because no customer ever requested their money back provides no basis for offset in determining a proper penalty.

Defendant did not cooperate with the CFTC at any point. His testimony in connection with these charges was consistently "vague and disingenuous" and intentionally designed to obfuscate and mislead. ***See Commodity Futures Trading***

**Commission v. Capital Blu Management, LLC**, 2011 WL 2357629 at *10 (N.D. Fla. June 9, 2011).  Further, he committed wide-ranging spoliation in this litigation, forcing the CFTC to expend enormous amounts of time and resources to uncover and expose his actions.  This court expended a concomitant degree of time and energy to hear and determine these largely ancillary matters.

It is plain defendant benefitted from his violations of the CEA and the 2001 Order insofar as he received money from customers for access to the ETS system, for which customers paid up to $6,000.  Defendant received at least $480,690.17 in revenues from ETS between October 2010 and October 2015.  That defendant plainly targeted inexperienced and vulnerable consumers makes his violations all the more egregious.

I therefore find that civil monetary penalties are warranted in this case.

Defendant committed literally hundreds of individual violations of the CEA and the 2001 Order during the relevant time period.  A substantial penalty therefore is justified.

Although defendant suggests that, for deterrence purposes, the penalty should be measured by his net profits rather than net revenues, **see R&W Technical Services**, 205 F.3d at 178, I am not persuaded.  Even if this were true in general,[21]

---

[21]  According to the court in **R&W Technical Services**, "[w]hen a penalty is designed for deterrence and not restitution, however, the proper measure of gain to the defendant is net profits, not gross revenues."  205 F.3d at 178.  The case on which it relied for that proposition, however, discussed the proper measure of disgorgement, not general civil monetary penalties.  **See Commodity Futures Trading Commission v. AVCO Financial Corp.**, 1998 WL 524901 at *1 (S.D.N.Y. Aug. 21, 1998), **aff'd in relevant part**, 228 F.3d 94 (1st Cir. 2000).  Moreover, the Fifth Circuit found the penalty there imposed excessive largely because there was substantial evidence that the defendant's trading system performed as well as any other (although not as well as advertising suggested) and that even the CFTC's own witness admitted to making $60,000 in a year using it.  **R&W Technical Services**, 205 F.3d at 178.  Those facts clearly distinguish that case from this one.

defendant's "suggestion that he . . . should have been penalized only to the extent of his profits utterly fails to account for the brazen, repeated, and intentional nature of his violations." **Levy**, 541 F.3d at 1112-13. Moreover, the penalty I impose here is principally for punitive, rather than deterrent, purposes. Given defendant's flagrant violations which gave rise to this lawsuit and his brazenly obstructionist and defiant conduct during the course of the litigation, the time for deterrence has passed.

The evidence shows defendant earned $480,690.17 from ETS between October 19, 2010, and October 28, 2015. (Tr. Exh. 137.) Three times that amount is $1,442,070.51. I find that amount to constitute an appropriate civil penalty in this case. *See Commodity Futures Trading Commission v. Arrington*, 2014 WL 314480 at *15-16 (D. Neb. Jan. 28, 2014); *Commodity Futures Trading Commission v. Alcocer*, 2013 WL 12104892 at *14 (S.D. Fla. Apr. 5, 2013); *Commodity Futures Trading Commission v. Hays*, 2011 WL 311366 at *5 (D. Minn. Jan. 28, 2011).

The CFTC suggests an additional penalty of $1 million should be added to the penalty to account for defendant's repeated violations of section 9(2) in his representations to and testimony before the CFTC. While the impetus behind this request is understandable, I find no reasoned basis on which to impose such a penalty. The CFTC has offered no legal authority to ground the exercise of my discretion in this regard, and its choice of a figure appears essentially arbitrary. I therefore decline to award civil monetary penalties above the amount stated above.[22]

---

[22] While the CFTC includes language in its proposed orders that would have me award prejudgment interest on the monetary awards assessed in this case, it offered no argument or analysis of its right *vel non* to an award of prejudgment interest. While "prejudgment interest is generally available to compensate the wronged party for being deprived of the monetary value of his loss from the time of the

## 2. Disgorgement

The CFTC also seeks disgorgement. *See* 7 U.S.C. § 13a-1(d)(3). Disgorgement is "a distinctly public-regarding remedy," intended to "deter violations of the laws by depriving violators of their ill-gotten gains." *Federal Trade Commission v. LoanPointe, LLC*, 525 Fed. Appx. 696, 698 (10th Cir. May 8, 2013). *See also Kokesh v. Securities and Exchange Commission*, – U.S. –, 137 S.Ct. 1635, 1644, 198 L.Ed.2d 86 (2017) (noting "in many cases . . . disgorgement is not compensatory").

Although in general, disgorgement should distinguish between legally and illegally derived proceeds, where a defendant's fraud has been "systematic and pervasive," as here, disgorgement is appropriately measured by the gross revenues attributable to the fraud. *Commodity Futures Trading Commission v. British American Commodity Options Corp*., 788 F.2d 92, 93-94 (2nd Cir.), *cert. denied*, 107 S.Ct. 186 (1986).

As noted above, defendant earned $480,690.17 in revenue between October 2010 and October 2015. The CFTC has limited its request for disgorgement to this amount, and I find this figure constitutes a reasonable approximation of defendant's ill-gotten gains. *See Securities Exchange Commission v. Curshen*, 372 Fed. Appx. 872, 882 (10th Cir. April 13, 2010). Defendant has offered nothing to meet his burden of demonstrating this approximation is not reasonable. *See Securities and Exchange*

---

loss to the payment of the judgment," *Anixter v. Home–Stake Products Co.*, 977 F.2d 1549, 1554 (10th Cir. 1992), *cert. denied*, 113 S.Ct. 1841 (1993) *and cert. denied*, 113 S.Ct. 1842 (citation and internal quotation marks omitted), an award is not a matter of right, *White v. Chafin*, 862 F.3d 1065, 1067 (10th Cir. 2017). By utterly failing to mention, much less address, the fact-intensive, two-part inquiry required to show entitlement to an award of pre-judgment interest, *see Caldwell v. Life Insurance Co. of North America*, 287 F.3d 1276, 1286 (10th Cir. 2002), the CFTC has waived or forfeited its right to such an award.

*Commission v. Calvo*, 378 F.3d 1211, 1217 (11th Cir. 2004), *aff'd*, 378 F.3d 1219 (11th Cir. 2004).

The CFTC expresses its intent to return the disgorged funds to defendant's customers, to the extent practicable, although defendant's shoddy record-keeping has made the task of identifying these individuals difficult.  I therefore will order the disgorged funds to by paid in a lump sum.  *See Federal Trade Commission v. Kuykendall*, 371 F.3d 745, 768 (10th Cir. 2004).

The CFTC proposes I appoint the National Futures Association ("NFA") to oversee the identification of recipients and the distribution of the disgorged funds.[23] Appointment of the NFA to serve in such a capacity appears to be a routine practice in cases of this nature.  *See, e.g.*, *United States Commodity Futures Trading Commission v. Gale*, 2013 WL 3776315 at *9 (D. Colo. June 25, 2013); *United States Commodity Futures Trading Commission v. Trimble*, 2013 WL 1726364 at *6 (D. Colo. March 14, 2013); *United States Commodity Futures Trading Commission v. Flint McClung Capital LLC*, 2012 WL 639321 at *12 (D. Colo. Feb. 28, 2012).  I thus find it appropriate to do so in this case as well.

---

[23] "NFA is the industrywide, self-regulatory organization for the U.S. derivatives industry." National Futures Association, *Our Mission* (available at: https://www.nfa.futures.org/about/index.html) (last accessed August 28, 2018).  "The same legislation that established the CFTC also authorized the creation of registered futures associations, giving the industry the opportunity to create a self-regulatory organization."  *Id.*, *About NFA, Who We Are* (available at: https://www.nfa.futures.org/about/index.html) (last accessed August 28, 2018).  With few exceptions, firms registered with the CFTC are required to be members of NFA, and the CFTC has delegated registration responsibility to NFA.  *Id.*, *About NFA, What We Do* (available at:  https://www.nfa.futures.org/about/index.html) (last accessed August 28, 2018).

### 3. Restitution

In addition, the CFTC seeks restitution of customers' losses between December 29, 2009, and October 18, 2010. *See* 7 U.S.C. § 13a-1. Defendant maintains restitution is barred by limitations under the logic of the Supreme Court's recent decision in ***Kokesh v. Securities and Exchange Commission***, – U.S. –, 137 S.Ct. 1635, 198 L.Ed.2d 86 (2017).

In ***Kokesh***, the Court addressed the applicability of 28 U.S.C. § 2462, the federal default limitations provision (which applies here as well), to claims for disgorgement under the securities laws. Section 2462 provides "an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued." The Court therefore considered whether disgorgement constituted a "penalty." ***Kokesh***, 137 S.Ct. at 1639. Finding disgorgement under the statute "bears all the hallmarks of a penalty," the Court held the five-year limitations period applied. ***Id.*** at 1644.

Defendant insists restitution under the CEA likewise is punitive because there is no requirement in the law that funds recovered as restitution be returned to victims. The ***Kokesh*** Court did note a similar feature of the Securities and Exchange Act as part of its determination that disgorgement thereunder was punitive in nature. ***See id.*** at 1645.

Nevertheless, I find far more compelling the ***Kokesh*** Court's observation that any remedy that serves a punitive purpose – even if punishment is not the sole or primary purpose thereof – constitutes punishment for purposes of applying section 2462. ***Id.***

Elsewhere, the Court has noted that restitution is not merely compensatory. *See Paroline v. United States*, 572 U.S. 464, 134 S.Ct. 1710, 1726, 188 L.Ed.2d 714 (2014) ("Restitution is an effective rehabilitative penalty because it forces the defendant to confront, in concrete terms, the harm his actions have caused."); *Kelly v. Robinson*, 479 U.S. 36, 49 n.10, 107 S.Ct. 353, ___ n.10, 93 L.Ed.2d 216 (1986) ("The primary goal of restitution is remedial or compensatory, but it also serves punitive purposes.") (internal citation omitted). *See also United States v. Zukerman*, 897 F.3d 423, 432-33 (2nd Cir. 2018). Indeed, *Kokesh* itself recognized that disgorgement is simply a form of restitution. *Kokesh*, 137 S.Ct. at 1640.

For these reasons, I find that the CFTC's request for restitution of amounts predating October 19, 2010, is barred by limitations.

### 4. Injunctive Relief

Lastly, the CFTC seeks an injunction permanently precluding defendant from registering with the CFTC, trading commodities for himself and others, and selling trading products and services. *See* 7 U.S.C. §§ 13a-1(a) & (b).

"The injunctive relief contemplated in this portion of the Act is remedial in nature, designed to prevent injury to the public and to deter illegal conduct. As such, restrictive concepts ordinarily associated with private litigation – such as proof of irreparable injury or inadequacy of other remedies – are not applicable to injunctive relief pursuant to the Act." *Trimble,* 2013 WL 317576 at *7 (internal citation omitted).

Rather, to be entitled to relief, the CFTC need show only (a) defendant has violated the CEA; and (b) there is a reasonable likelihood of future violations. *Id.*

In considering whether defendant is likely to violate the law in the future, courts consider, "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." **Brockbank**, 505 F.Supp.2d at 1173 (internal quotation marks and footnote omitted).

All these factors weigh in favor of a permanent injunction in this case. Defendant's violations of the CEA and the 2001 Order were repeated, long-standing, and flagrant. Over the course of years, and in the face of the 2001 Order, he continued to make patently false and misleading claims specifically intended to defraud customers. These were not isolated incidents; the very nature of defendant's trading business depended on exaggerating (or outright lying) about the benefits of his trading system while substantially minimizing the potential risks associated with it.

Moreover, defendant's violations were not unwitting or innocent. Indeed, they were identical to the very infractions that led to the entry of the 2001 Order. Defendant's claims of ignorance about the nature and scope of the 2001 Order simply defy credulity. Further, his behavior during the course of this litigation and the investigation which preceded it point inexorably to the conclusion that he knew he was violating both the law and the 2001 Order and tried desperately (if ineffectually) to conceal his malfeasance.

Nothing in the record before me indicates defendant acknowledges the wrongful nature of his conduct. The very way in which he has defended this litigation

demonstrates otherwise. Defendant repeatedly has sought to avoid responsibility for his actions, even in the face of evidence clearly demonstrating his culpability. He has destroyed and altered evidence, given evasive or patently false answers in discovery, withheld relevant documents, and generally assumed an overall strategy of obfuscation and stonewalling.

He has offered no assurances that he will not continue to violate the CEA and the 2001 Order in the future, and any such assurances would be thoroughly belied by the evidence. "While past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is highly suggestive of the likelihood of future violations." *Id.* (internal quotation marks and footnote omitted). That conclusion is inescapable here.

Moreover, the evidence suggests that defendant's sole occupation has and is the purveying of similar futures trading schemes to consumers. Defendant has testified he has no other occupation and has not been gainfully employed since January 2016.

I therefore find and conclude the CFTC is entitled to a permanent injunction. The injunction will include both registration and personal trading bans. *See Commodity Futures Trading Commission v. Harrison*, 255 F.Supp.3d 645, 647 (D.S.C. 2015); *United States Commodity Futures Trading Commission v. U.S. Ventrues L.C.*, 2014 WL 3889068 at *10 (D. Utah June 6, 2014), *aff'd*, 630 Fed. Appx. 783 (Oct. 27, 2015); *Trimble*, 2013 WL 317576 at *10; *Commodity Futures Trading Commission v. Hayes*, 2007 WL 858772 at *5 (E.D. Va. March 13, 2007); *Commodity Futures Trading Commission v. Poole*, 2006 WL 1174286 at *6-7 (M.D.N.C. May 1, 2006).

The injunction will be appropriately broad to address the nature and scope of the violations which have been proven.

## IV. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1. The judgment shall enter on behalf of plaintiff, the United States Commodity Futures Trading Commission, and against defendant, Gregory L. Gramalegui, as to Counts I, II,[24] III, and IV of the **Complaint** [#1, filed October 19, 2015;

2. That defendant, Gregory L. Gramalegui, is permanently restrained, enjoined, and prohibited from directly or indirectly engaging in conduct violative of 7 U.S.C. §§ 6o(1) and 9(2) (2012); 17 C.F.R. § 4.41(a)(3) and (b) (2017); and the CFTC's July 12, 2001 "Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act and Making Findings and Imposing Remedial Sanctions as to Respondent Gregory L. Gramalegui;"

3. That defendant, Gregory L. Gramalegui, is permanently restrained, enjoined, and prohibited from, directly or indirectly:

> a. trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40) (2012));
>
> b. entering into any transactions involving commodity interests (as that term is defined in 17 C.F.R. § 1.3(yy) (2017)) for his own personal account or for any account in which he has a direct or indirect interest;
>
> c. having any commodity interests traded on his behalf;
>
> d. controlling or directing the trading for or on behalf of any

---

[24] Judgment as to Count II includes those matters found in favor of the CFTC in my **Order Re: Objections to Recommendation of the United States Magistrate Judge** [#273], filed July 31, 2017.

other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

e. soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f. applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9) (2017);

g. acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2017)), agent or other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38) (2012)) registered, exempted from registration or required to be registered with the CFTC, except as provided for in 17 C.F.R. § 4.14(a)(9); and

h. engaging in any business activities relating to or involving commodity interests (as that term is defined in 17 C.F.R. § 1.3(yy)), including, but not limited to, engaging in any business that develops, markets, or offers for sale any products or services relating to trading commodity futures, options on commodity futures, commodity options, swaps, security futures products, and/or forex contracts;

4.   That defendant, Gregory L. Gramalegui, shall pay a civil monetary penalty in the amount of one million, four hundred forty two thousand, seventy dollars and fifty one cents ($1,442,070.51) ("Civil Monetary Penalty Obligation" or "CMP Obligation"), plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961 from the date of entry of the Final Judgment until paid in full;

5.   That defendant shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If

payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

MMAC/ESC/AMK326
Commodity Futures Trading Commission
Division of Enforcement
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
(405) 954-6569 office
(405) 954-1620 fax
9-AMC-AR-CFTC@faa.gov

If payment is to be made by electronic funds transfer, defendant shall contact Marie Thorne or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendant shall accompany payment of the CMP Obligation with a cover letter that identifies defendant and the name and docket number of this proceeding. Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581 and to Richard Glaser, Deputy Director, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581;

6. That defendant, Gregory L. Gramalegui, shall pay disgorgement in the amount of four hundred eighty thousand, six hundred ninety dollars and seventeen cents ($480,690.17) ("Disgorgement Obligation"), plus post-judgment interest at the rate set forth in 28 U.S.C. § 1961 from the date of entry of the Final Judgment until paid in full;

7. That the National Futures Association ("NFA") is appointed as Monitor to receive the Disgorgement Obligation and make disbursements to defendant's

customers therefrom; and because the Monitor is acting as an officer of the court in performing these services, the NFA shall not be liable for any action or inaction arising from its appointment as Monitor, other than actions involving fraud;

8.  That defendant, Gregory L. Gramalegui, shall make the Disgorgement Obligation payment to the Monitor in the name of the "Emini Trading School and Gregory L. Gramalegui Judgment Fund" and shall send such payments by electronic funds transfer or U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606, under a cover letter that identifies defendant and the name and docket number of this proceeding.  Defendant shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 and to Richard Glaser, Deputy Director, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581;

9.  That to the extent practicable, the Disgorgement Obligation shall be disbursed as restitution to defendant's customers for amounts paid to defendant to purchase Emini Trading School products and services between October 19, 2010, and October 19, 2015; provided further, any amount remaining after a reasonable period for identifying customers and distributing funds (not to exceed two years from the entry of Final Judgment) shall revert to the U.S. Treasury as disgorgement;

10.  That the Monitor shall develop a procedure for publicizing this Order in a manner designed to notify, as best as practicable, customers who purchased a product

or service from Emini Trading School between October 19, 2010, and October 19, 2015, that funds have been set aside for restitution of their payment amounts ("Eligible Customers"); and the Monitor shall use a reasonable amount of the Disgorgement Obligation for this purpose;

11.  That the Monitor shall develop a procedure for receiving evidence of entitlement to restitution from Eligible Customers. To qualify for restitution, an Eligible Customer must provide (1) proof of purchase of an ETS product or service; (2) proof of date of purchase; and (3) proof of purchase price.  The Monitor has discretion to determine whether, in each instance, an Eligible Customer's proof is sufficient under a preponderance of the evidence standard.  Proof that may be deemed sufficient includes, but is not limited to, (1) a copy of an ETS order form submitted by the customer; (2) the customer's credit card statement showing charges; and/or (3) email correspondence with defendant referencing the Eligible Customer's purchase;

12.  That the Monitor has discretion to determine entitlement to and the manner of distribution to Eligible Customers and should do so in an equitable manner; provided further, the Monitor may defer distribution to Eligible Customers until such time as the Monitor deems appropriate;

13.  That in the event the Monitor determines that the administrative cost of making distributions to some or all Eligible Customers is impractical, the Monitor may in its discretion revert Disgorgement Obligation payments to the U.S. Treasury, provided the Disgorgement Obligation and CMP Obligation have been satisfied in full;

14.  That defendant, Gregory L. Gramalegui, shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and

appropriate to carry out its duties as set forth above;

15. That defendant, Gregory L. Gramalegui, shall execute any documents necessary to release his funds frozen as a result of the asset freeze entered in this case in any repository, bank, investment or other financial institution to the NFA as payment toward the Disgorgement Obligation, and once these frozen funds are released, the Monitor shall notify the CFTC of defendant's compliance with this requirement, at which point the CFTC will petition the court to lift the asset freeze;

16. That until the Disgorgement Obligation is fully distributed as restitution or until the Monitor determines that all remaining funds shall revert to the U.S. Treasury under the discretion granted herein, the Monitor shall provide the CFTC at the beginning of each calendar year with a report detailing the disbursement of funds to Defendant's customers during the previous year; provided further, the Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581 and to Richard Glaser, Deputy Director, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581;

17. That the amounts distributed as restitution to each Eligible Customer shall not limit recovery of a greater amount from defendant, and nothing herein shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law;

18. That to the extent that any funds accrue to the U.S. Treasury for satisfaction of defendant's Disgorgement Obligation, such funds shall be transferred to the Monitor

for disbursement in accordance with the procedures set forth above;

19.  That acceptance by the CFTC or the Monitor of any partial payment of defendant's Disgorgement Obligation or CMP Obligation shall not be deemed a waiver of his obligation to make further payments pursuant to this Order, or a waiver of the CFTC's right to seek to compel payment of any remaining balance;

20.  That all notices required to be given by any provision in this Order shall be sent certified mail, return receipt requested, as follows:

> To the CFTC:
>
> Richard Glaser, Deputy Director
> Commodity Futures Trading Commission
> Three Lafayette Centre
> 1155 21st Street, NW
> Washington, D.C. 20581
>
> To the NFA:
>
> Daniel Driscoll, Executive Vice President, COO
> National Futures Association
> 300 S. Riverside Plaza, Suite 1800
> Chicago, IL 60606-3447;

All such notices to the CFTC or the NFA shall reference the name and docket number of this action;

21.  That until such time as defendant satisfies in full his Disgorgement Obligation and CMP Obligation as set forth in this Order, defendant shall provide written notice to the CFTC by certified mail of any change to his telephone number and mailing address within ten (10) calendar days of the change;

22.  That If any provision of this Order or if the application of any provision or circumstance is held invalid, then the remainder of this Order and the application of the

provision to any other person or circumstance shall not be affected by the holding;

23.  That the court shall retain jurisdiction of this action to ensure compliance with this Order and for all other purposes related to this action, including any motion by defendant to modify or for relief from the terms of this Order;

24.  That the injunctive and equitable relief provisions of this Order shall be binding on defendant and on any persons who are acting in the capacity of agent, officer, employee, servant, attorney, attorney-in-fact, successor and/or assign of defendant, and on any person acting in active concert or participation with defendant who receives actual notice of this Order by personal service or otherwise; and

25.  That the CFTC is awarded its costs, to be taxed by the clerk of the court in the time and manner required by Fed. R. Civ. P. 54(d)(1) and D.C.COLO.LCivR 54.1.

Dated September 26, 2018, at Denver, Colorado.

**BY THE COURT:**

Bob Blackburn
Robert E. Blackburn
United States District Judge